742 F.2d 72
 6 Soc.Sec.Rep.Ser. 236, Medicare&Medicaid Gu 34,106
Douglas J. COSPITO, et al., Appellants,
v.
Margaret M. HECKLER, etc., et al., and The Joint Commission
on Accreditation of Hospitals, Appellees.
Douglas J. COSPITO, et al., Cross-Appellees,
v.
Margaret M. HECKLER, etc., et al., and The Joint Commission
on Accreditation of Hospitals, Cross-Appellant.
 Nos. 83-5201, 83-5202.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 23, 1984.
Decided Aug. 10, 1984.
As Amended Aug. 29, 1984.
 
 Joseph H. Rodriguez, Michael Perlin, Michael Buncher (Argued), Laura Lewinn, William F. Culleton, Jr., New Jersey Dept. of the Public Advocate, Trenton, N.J., for appellants and cross-appellees.
 Eugene M. Haring (Argued), Ronald Hedges (Argued), Kathleen Miko, McCarter & English, Newark, N.J., for appellee and cross-appellant Joint Commission on Accreditation of Hospitals.
 W. Hunt Dumont, U.S. Atty., Mary Catherine Cuff (Argued), Asst. U.S. Atty., Newark, N.J., for appellee Margaret Heckler.
 Thomas K. Gilhool, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for amici curiae The Joint Advocacy Coalition for the Mentally Disabled; The National Citizens Coalition for Nursing Home Reform; The South Carolina Protection and Advocacy System; The Arkansas Legal Services Support Center; and The Southern Poverty Law Center.
 Before SEITZ, GARTH and BECKER, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 Appellants Douglas Cospito, et al., ("the Patients") are or have been patients at the Trenton Psychiatric Hospital ("TPH"). In 1975, TPH lost its accreditation from codefendant Joint Commission on Accreditation of Hospitals ("JCAH"). As a result, codefendant Secretary of the Department of Health, Education, and Welfare (now the Department of Health and Human Services) terminated various federal benefits which were conditioned upon the beneficiaries being treated at a qualified psychiatric hospital. Those benefits were denied until TPH reacquired its accreditation several years later.
 
 
 2
 The Patients brought this action in district court challenging the loss of their federal benefits on several constitutional grounds. After lengthy discovery, cross motions were made for summary judgment on various legal issues. The district court found in favor of the defendants on sufficient issues to dismiss all claims made by the Patients. For the reasons expressed below, we will affirm the dismissal of the action.
 
 I.
 A.
 
 3
 Trenton Psychiatric Hospital is a state facility located in Trenton, New Jersey, and is operated as a component of the Division of Mental Health and Hospitals, New Jersey State Department of Human Services. It treats both voluntarily and involuntarily committed patients for mental disease. The facilities itself consist of a complex of buildings, divided into Units for adult patients, geriatric patients, and children (ages 6 through 17).
 
 
 4
 Beginning in 1973, TPH was surveyed under the standards for "psychiatric facilities" recently promulgated under the auspices of JCAH.[1] Following the 1973 survey, major deficiencies were disclosed in several areas, including patient treatment, staffing, environment, and fire safety. TPH was accredited for only one year, and was notified that these deficiencies must be corrected to maintain accreditation. In 1974, however, many of the same deficiencies were found again. A preliminary decision was made by JCAH not to accredit. At TPH's request, a resurvey was conducted in May, 1975, which again resulted in a preliminary decision not to accredit. TPH did not appeal from that decision, and the deaccreditation became final.
 
 
 5
 In 1976, TPH requested that the Children's Unit of the hospital be evaluated separately. JCAH thereupon reviewed the data which had been collected during the previous 1975 survey, and concluded that, standing alone, the Children's Unit had met the requisite standards, and therefore retroactively restored its accreditation. TPH also sought reaccreditation of the Adult Unit of the hospital in 1977 and 1979, but both times JCAH determined that accreditation should not be granted. Finally, in 1981, following another survey by JCAH, the Adult Unit regained its accreditation, and continues to operate under that approval today.
 
 B.
 
 6
 JCAH is an Illinois not-for-profit corporation formed in 1951 for the purpose of creating and maintaining professional standards for evaluating hospital performance. The body is governed by a twenty-two member Board of Commissioners. Its constituent members consist of the American College of Physicians, the American College of Surgeons, the American Dental Association, the American Hospital Association, and the American Medical Association.
 
 
 7
 Prior to the events at TPH, JCAH had formed various accreditation councils to advise the Board of Commissioners on the establishment of standards for accreditation of health care facilities. It was the Accreditation Council for Psychiatric Care which presented to the Board the criteria for inspection of psychiatric hospitals under which TPH was examined in 1975.[2] The survey itself consists of an on-site visit conducted by a team of surveyors designated by JCAH. The surveyors evaluate the quality of the facility's environment and review its administrative records to determine whether they conform to applicable standards.[3] From the information collected during this survey, the Accreditation Committee makes a preliminary decision to accredit or not to accredit. Should the preliminary decision be adverse to the facility, it is entitled to review by the Accreditation Council and to ultimate review by JCAH's Board of Commissioners.
 
 
 8
 JCAH accreditation, however, must be distinguished from certification by the Secretary for eligibility in federal assistance programs. While JCAH accreditation may, depending on the circumstances, be a component of certification, the two are not necessarily coextensive, and at least as a matter of terminology, we will refer to the two separately.
 
 C.
 
 9
 The Patients at TPH had, before decertification by the Secretary, been the beneficiaries of three types of federally funded benefits: (1) Medicare, (2) Medicaid, and (3) Supplemental Social Security Income.
 
 1. Medicare
 
 10
 Medicare is a federally funded health insurance program for those over the age of 65, which provides basic protection against the costs of hospital and related post-hospital services. 42 U.S.C. Secs. 1395-1395x. Among the institutions eligible to participate in this program are "psychiatric hospitals," as defined in 42 U.S.C. Sec. 1395x(f):
 
 
 11
 The term "psychiatric hospital" means an institution which--
 
 
 12
 (1) is primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill persons;
 
 
 13
 (2) satisfied the requirements of paragraphs (3) through (9) of subsection (e) of this section;
 
 
 14
 (3) maintains clinical records on all patients and maintains such records as the Secretary finds to be necessary to determine the degree and intensity of the treatment provided to individuals entitled to hospital insurance benefits under part A;
 
 
 15
 (4) meets such staffing requirements as the Secretary finds necessary for the institution to carry out an active program of treatment for individuals who are furnished services in the institution; and
 
 
 16
 (5) is accredited by the Joint Commission on Accreditation of Hospitals.
 
 
 17
 (Emphasis added).
 
 
 18
 The statute further provides, however, that:
 
 
 19
 In the case of an institution which satisfied paragraphs (1) and (2) of the preceding sentence and which contains a distinct part which also satisfies paragraphs (3) and (4) of such sentence, such distinct part shall be considered to be a "psychiatric hospital" if the institution is accredited by the Joint Commission on Accreditation of Hospitals or if such distinct part meets requirements equivalent to such accreditation requirements as determined by the Secretary.
 
 
 20
 Id. (emphasis added). Under this "distinct part" survey, an institution may bypass JCAH accreditation and seek certification directly from the Secretary for such of its parts that qualify. Indeed, nothing precludes the certification of an entire institution through successive "distinct part" surveys.
 
 2. Medicaid
 
 21
 Medicaid is a joint federal/state program in which the federal government extends financial assistance directly to the State in order that the State may provide a medical program of its own design. 42 U.S.C. Secs. 1396-1396p. To participate, the State must submit a medical assistance plan which meets with the approval of the Secretary. Id. Secs. 1396-1396a.
 
 
 22
 Among the expenses Medicaid will cover are "inpatient hospital services in an institution for mental diseases," for patients over the age of 65. 42 U.S.C. Sec. 1396d(a)(14). The statute itself does not define "inpatient hospital services," but apparently leaves that definition to administrative regulation. 42 C.F.R. Sec. 440.140, in turn, incorporates into the Medicaid provisions the definitions established by Medicare:(a) Inpatient hospital services. (1) "Inpatient hospital services for individuals age 65 or older in institutions for ... mental diseases" means services provided under the direction of a physician for the care and treatment of recipients in--
 
 
 23
 (ii) An institution for mental diseases that meets the requirements under Medicare. Secs. 405.1035 and 405.1036 of this chapter ....
 
 
 24
 (2) "Institution for mental diseases" means an institution that is primarily engaged in providing diagnosis, treatment, or care of individuals with mental diseases, including medical care, nursing care, and related services.
 
 
 25
 (Emphasis added). Thus, the Secretary's regulations would allow a psychiatric hospital for adult patients to be deemed qualified for Medicaid either through JCAH accreditation, or by "distinct part" survey as allowed under Medicare.
 
 
 26
 Medicaid will also cover inpatient psychiatric hospital services for individuals under the age of 21. 42 U.S.C. Sec. 1396d(a)(16). Here, the statute provides an explicit definition for "inpatient psychiatric hospital services:"
 
 
 27
 For purposes of paragraph (16) of subsection (a) of this section, the term "inpatient psychiatric hospital services for individuals under age 21" includes only--
 
 
 28
 (A) inpatient services which are provided in an institution which is accredited as a psychiatric hospital by the Joint Commission on Accreditation of Hospitals;
 
 
 29
 (B) inpatient services which, in the case of any individual (i) involve active treatment which meets such standards as may be prescribed in regulations by the Secretary, and (ii) a team, consisting of physicians and other personnel qualified to make determinations with respect to mental health conditions and the treatment thereof, has determined are necessary on an inpatient basis and can reasonably be expected to improve the condition, by reason of which such services are necessary, to the extent that eventually such services will no longer be necessary ....
 
 
 30
 42 U.S.C. Sec. 1396d(h)(1). Read literally, this section would require accreditation by JCAH in order to be certified for Medicaid participation, without the possibility of certification through the alternative procedure of the "distinct part" survey allowed under Medicare. Appellees contended, however, that the option of seeking such certification through a "distinct part" survey may be implied, and therefore the Medicaid benefits of patients under 21 are not dependent on JCAH accreditation. See infra note 10.
 
 3. Social Security Benefits
 
 31
 Although residents of public institutions are generally excluded from receiving Social Security benefits, an exception is made for those patients, otherwise eligible, who are being treated at an institution receiving payments under Medicaid. 42 U.S.C. Sec. 1382(e)(1)(A) & (B).[4] Such patients are entitled to an allowance of up to $25.00 per month. Congress intended that this stipend be available "to purchase small comfort items not supplied by the institution." H.R.Rep. No. 231, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Ad.News 4989, 5136.
 
 4.
 
 32
 When TPH was decertified in 1975, all of the benefits described above were terminated, since TPH was no longer an institution eligible under Medicare and Medicaid. When the Children's Unit was reaccredited and thus recertified, however, their benefits were restored, since it was determined that the Unit had, standing alone, always been so qualified. Provision was made to pay out benefits which had been withheld in the interim period from December 21, 1975 to December 8, 1976.[5] The benefits of patients in the Adult Unit, on the other hand, were not restored until the Unit regained its accreditation in 1981, and payments withheld from 1975 to 1981 were not paid retroactively.
 
 II.
 
 33
 The Patients brought suit in district court alleging that deprivation of their Medicare, Medicaid, and Social Security benefits was unconstitutional. They alleged lack of procedural due process, lack of substantive due process, lack of equal protection, and unconstitutional delegation of authority to JCAH.[6]
 
 
 34
 After exhaustive discovery over the course of six years, both sides in this dispute sought summary judgment on the various claims and issues presented.[7] Upon consideration of the submissions, the district court found that the termination of the federal benefits did not violate procedural or substantive due process, nor did it offend equal protection. It also found that there was no unconstitutional delegation of authority to JCAH.[8] The district court therefore dismissed all claims against JCAH and the Secretary.[9]
 
 III.
 
 35
 As a threshold matter, we must first consider whether all aspects of this controversy remain as live disputes which are capable of adjudication. In particular, we previously have noted that the Children's Unit of TPH not only regained its accreditation by JCAH, but all benefits which were withheld during the interim period of decertification were retroactively restored. See supra note 5. The district court was of the opinion that, insofar as this case involves the claims of patients in the Children's Unit, it was moot. App. at 79-80. We agree.
 
 
 36
 Because all benefits have been restored to residents of the Children's Unit, there is no question over repayment of funds to them. Nor is this a case in which there is a reasonable expectation that the same complaining parties would be subject to the same action again. See, e.g., Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam); see also Defunis v. Odegaard, 416 U.S. 312, 319-20, 94 S.Ct. 1704, 1707-08, 40 L.Ed.2d 164 (1974) (per curiam). Nothing in the record suggests that the Children's Unit at TPH will again lose its certification, and thus place its residents in the position of losing federal funds. Cf. Doe v. Colautti, 592 F.2d 704, 707 (3d Cir.1979) (case not moot where medical evidence in record showed actual likelihood of patient's future hospitalization). As this Court has noted explicitly, the "mere conjecture" that a health care provider will lapse into non-compliance with the Secretary's requirements does not suffice to revive a case from mootness. Klein v. Califano, 586 F.2d 250, 255 n. 6 (3d Cir.1978) (en banc). The Children's Unit is now "in the position of any other qualified Medicaid provider whose prospect of future noncompliance does not constitute a situation 'capable of repetition but evading review.' " Id.
 
 
 37
 We therefore find, as did the district court, that this action is moot insofar as it pertains to patients at TPH's Children's Unit.[10] We also note that, because the Adult Unit has been recertified, this case is also moot insofar as it pertains to any claim for prospective equitable relief. Id. at 255. Since the benefits of patients in the Adult Unit were not restored, however, the controversy remains alive with respect to claims for retroactive relief.
 
 IV.
 
 38
 We turn now to the constitutional claims that remain alive for adjudication. The Patients' first contention is that the termination of their benefits without allowing them to participate in the mechanics of the accreditation by JCAH denied them procedural due process. We find, however, that there has been no deprivation of a protectable interest by the government within the meaning of the fifth amendment,[11] and therefore the due process clause is not implicated.
 
 
 39
 A claim of unconstitutional deprivation under the fifth amendment has three essential elements:
 
 
 40
 1) the claimant must be "deprived" of a protectable interest;
 
 
 41
 2) that deprivation must be due to some government action; and
 
 
 42
 3) the deprivation must be without due process.
 
 
 43
 Thus, if either of the first two elements are missing, we never reach consideration of what process is "due," since the circumstances which implicate the due process requirement would not be present.
 
 
 44
 Our analysis of the procedural due process aspects of this case is guided by the Supreme Court's decision in O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), which involved facts comparable to those presented here. In Town Court, residents of a nursing home claimed a violation of due process when they lost federal benefits as a result of the decertification of their facility. Like the Patients here, they claimed a right to a pretermination hearing.
 
 
 45
 The Supreme Court found as a threshold matter, however, that the residents of the nursing home had not been deprived of any protectable property interest, and thus, absent this foundation, no due process right was triggered. Writing for the Court, Justice Stevens found that patients did not have a settled interest in receiving benefits at any facility, including a decertified one, and therefore there had been no deprivation of "property."
 
 
 46
 Whether viewed singly or in combination, the Medicaid provisions ... do not confer a right to continued residence in the home of one's choice. Title 42 U.S.C. Sec. 1396 gives recipients the right to choose among a range of qualified providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.... Since decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility, regulations granting recipients the right to a hearing prior to a reduction in financial benefits are irrelevant.
 
 
 47
 In holding that these provisions create a substantive right to remain in the home of one's choice absent specific cause for transfer, the Court of Appeals failed to give proper weight to the contours of the right conferred by the statutes and regulations. As indicated above, while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified.
 
 
 48
 Town Court, 447 U.S. at 785-86, 100 S.Ct. at 2475-76 (emphasis in original). The Supreme Court found as a threshold matter, therefore, that the residents of the nursing home had not been deprived of any protectable property interest. "[N]one of these patients will lose the ability to finance his or her continued care in a properly licensed institution." Id. at 787, 100 S.Ct. at 2476. Thus, the due process clause of the Fifth Amendment was never triggered.
 
 
 49
 The Patients contend, however, that Town Court is distinguishable from this case because, here, the residents of TPH have been involuntarily committed,[12] and they therefore cannot choose to move to another facility at will. Thus, the freedom to select among a range of qualified institutions, and to move out of a decertified facility--an assumption which is at least implicit in the Town Court decision--is arguably absent here. For purposes of this appeal from the grant of summary judgment, we will take as true the Patients' contention that they do not have the freedom to transfer out of TPH to another facility.[13] Since the Patients are thus not in a position to receive any federal benefits at another qualified facility, it would appear that this case is different from some aspects of the Town Court decision, at least to the extent that the Patients here have actually been "deprived" of the protectable property interest of being able to receive Medicaid and Medicare at some institution.[14]
 
 
 50
 At best, however, this advances the Patients' argument but one step further in the analysis, and we do not believe that it alters the disposition of this case. It is elemental that not all deprivations of property implicate the due process clause, but only those deprivations which were the result of some governmental action. In this context, the Supreme Court in Town Court noted that deprivations which are only the indirect result of a government decision are not cognizable under the due process clause.
 
 
 51
 Over a century ago this Court recognized that the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action. Thus, in the Legal Tender Cases, 12 Wall. (79 U.S.) 457, 551, 20 L.Ed. 287, the Court stated:
 
 
 52
 "That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals."
 
 
 53
 More recently, in Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, we rejected the argument made by the parents of a girl murdered by a parolee that a California statute granting absolute immunity to the parole board for its release decisions deprived their daughter of her life without due process of law:
 
 
 54
 "A legislative decision that has an incremental impact on the probability that death will result in any given situation--such as setting the speed limit at 55-miles-per-hour instead of 45--cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander." Id., at 281, 100 S.Ct., at 557.
 
 
 55
 Similarly, the fact that the decertification of a home may lead to severe hardship for some of its elderly residents does not turn the decertification into a governmental decision to impose that harm.
 
 
 56
 447 U.S. at 789, 100 S.Ct. at 2477 (emphasis added). In the specific circumstances of a governmental decision to decertify a health care facility, the Court held:
 
 
 57
 This case does not involve the withdrawal of direct benefits. Rather, it involves the Government's attempt to confer an indirect benefit on Medicaid patients by imposing and enforcing minimum standards of care on facilities like Town Court. When enforcement of those standards requires decertification of a facility, there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.
 
 
 58
 Id. at 787, 100 S.Ct. at 2476 (emphasis added).
 
 
 59
 We find that Town Court's distinction between the direct and indirect effects of "government action" provides the definitive answer to the Patients' procedural due process claims. Indeed, insofar as the question of government action is concerned, the present case is indistinguishable from Town Court. In both cases, there was no governmental decision or intent to impose hardship upon the Patients. Rather any hardship was merely the indirect result of the government's decision to enforce minimum standards of care at facilities participating in Medicaid and Medicare.[15]
 
 
 60
 Moreover, as we have noted above, the only factor which even arguably distinguishes this case from Town Court is the fact that, because the Patients are unable to transfer out of TPH, they are barred from receiving federal benefits at another qualified institution. Thus, they contend that there has been an actual "deprivation" of a protectable interest. Even accepting that contention, however, we note that the defendants here, JCAH and the Secretary, clearly had nothing to do with the fact that the Patients are so confined. If anyone is responsible for that circumstance, it is the State of New Jersey. Insofar as the commitment of the Patients to TPH has caused a deprivation of property, therefore, we do not see how the Secretary can be deemed to have induced, either directly or indirectly, that deprivation.
 
 
 61
 Because any loss of benefits to the Patients was only "indirectly" caused by the Secretary's decision to decertify TPH, whatever deprivation which was suffered was not the result of any governmental action. The Patients are therefore not in a position to claim any fifth amendment due process protection, since even if they alleged a "deprivation," the further requirement that the deprivation be caused by the government has not been met.[16] We therefore affirm the district court's grant of summary judgment on this issue.[17]
 
 V.
 
 62
 We next address the Patients' equal protection argument that the federal statutes create an impermissible distinction between patients in a psychiatric hospital and those in a general hospital. The thrust of the Patients' contentions is that psychiatric hospitals will lose federal benefits more readily than a general hospital if deaccreditated by JCAH, since such deaccreditation apparently does not affect in any way a general hospital's participation in Medicare or Medicaid, 42 U.S.C. Sec. 1395x(e),[18] whereas a psychiatric hospital must either be JCAH accredited, or else certified under the "distinct part" survey in order to qualify. This, it is argued, amounts to discrimination against the mentally ill.
 
 
 63
 Even assuming that this administrative distinction between general and psychiatric hospitals in the procedures used for certification expressly creates the kind of classification which invokes equal protection analysis (but see Schweiker v. Wilson, 450 U.S. 221, 231-32, 101 S.Ct. 1074, 1081-82, 67 L.Ed.2d 186 (1981), discussed infra), the Patients have not made out a cognizable constitutional claim. As this court has noted, classification according to mental illness has not been recognized as a suspect class which requires heightened or strict scrutiny under the equal protection clause. Doe v. Colautti, 592 F.2d 704, 710-11 (3d Cir.1979).[19] Accord, Legion v. Richardson, 354 F.Supp. 456 (S.D.N.Y.) (three judge court), aff'd sub nom. Legion v. Weinberger, 414 U.S. 1058, 94 S.Ct. 564, 38 L.Ed.2d 465 (1973) (affirming without opinion). In order to pass constitutional muster, therefore, challenged legislation need only be shown to bear a rational relationship to a legitimate congressional goal. E.g. Weinberger v. Salfi, 422 U.S. 749, 768-770, 95 S.Ct. 2457, 2468-2469, 45 L.Ed.2d 522 (1975).
 
 
 64
 The troubled and sometimes sordid history of abuses and neglect which have been peculiar to mental institutions was a situation certainly well known to Congress when it enacted the federal medical assistance programs.[20] In light of these circumstances, there is certainly a rational basis for Congress to require that certification of psychiatric hospitals be undertaken with special care and attention. Thus, even assuming the separate certification procedures for psychiatric hospitals evinces a congressional intent to treat the mentally ill as a distinct group, such classification and special treatment is rational, and is therefore completely within the constitutional restraints imposed by the equal protection clause.
 
 VI.
 
 65
 We next turn to the Patients' argument that the termination of their Social Security benefits violates substantive due process. They argue that the cessation of their $25.00 per month comfort allowance is in effect punishment for circumstances over which the Patients had no control, i.e., the inadequate conditions at TPH, and is therefore irrational. See Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (legal burdens should have some relationship to responsibility or wrongdoing). We find, however, that the termination of this Social Security benefit for patients in decertified hospitals, while perhaps harsh, is not a violation of substantive due process.
 
 
 66
 In the area of social welfare appropriations legislation, the analysis under substantive due process is essentially the same as an equal protection analysis, i.e., is there a rational basis underlying the legislation in question? See Clayborne v. Califano, 603 F.2d 372, 380-81 n. 17 (2d Cir.1980). Indeed, the primary case cited by the Patients on this point, Plyler v. Doe, itself invokes an equal protection analysis. We therefore proceed with our inquiry under the "rational basis" test.
 
 
 67
 Here, the Patients lost their SSI comfort allowance due to the fact that eligibility for such payments is conditioned upon eligibility for Medicaid. The constitutionality of this relationship was explicitly discussed in Schweiker v. Wilson, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). There, the court noted that the decision by Congress to incorporate Medicaid eligibility standards into the provision for SSI benefits was "a deliberate and well considered choice." Id. at 235, 101 S.Ct. at 1083. The Court continued:
 
 
 68
 Having found the adoption of the Medicaid standards intentional, we deem it logical to infer from Congress' deliberate action an intent to further the same subsidiary purpose that lies behind the Medicaid exclusion, which, as no party denies, was adopted because Congress believed the States to have a "traditional" responsibility to care for those institutionalized in public mental institutions. The Secretary, emphasizing the then-existing congressional desire to economize in the disbursement of federal funds, argues that the decision to limit distribution of the monthly stipend to inmates of public institutions who are receiving Medicaid funds "is rationally related to the legitimate legislative desire to avoid spending federal resources on behalf of individuals whose care and treatment are being fully provided for by state and local government units" and "may be said to implement a congressional policy choice to provide supplemental financial assistance for only those residents of public institutions who already receive significant federal support in the form of Medicaid coverage." .... We cannot say that the belief that the States should continue to have the primary responsibility for making this small "comfort money" allowance available to those residing in state-run institutions is an irrational basis for withholding from them federal general welfare funds.
 
 
 69
 Id. at 236-37, 101 S.Ct. at 1084 (emphasis added). Thus, as the Wilson court noted, Congress may rationally determine under which circumstances the federal government will assume a measure of responsibility for the care and comfort of patients in public institutions, and when it will leave that responsibility to the states. Wilson thus determined that the decision to expend federal funds in order to provide a "comfort allowance" only for those already eligible for assistance under Medicaid was a rational judgment aimed at the most effective use of federal money.
 
 
 70
 Having found that a rational policy underlies the general decision to tie SSI comfort benefits to Medicaid, it is perhaps unnecessary to determine whether that policy is actually served in the particular factual setting of this case. As the Supreme Court noted in Weinberger v. Salfi, 422 U.S. 749, 777, 95 S.Ct. 2457, 2472-73, 45 L.Ed.2d 522 (1975):
 
 
 71
 [T]he question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in Mourning [v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318], supra. Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.
 
 
 72
 At any rate, we find ample justification for the requirement that recipients of SSI benefits be treated only at Medicaid certified institutions.[21] As noted above, it is uniquely the role of Congress to determine when the federal treasury will assume some of the State's responsibility to provide for the welfare and comfort of a patient at a public institution. In particular, federal law provides that the United States will not assume financial obligations for patients in substandard public hospitals, but rather will insist that the State fulfill its duty to such patients, in at least adequate measure, before receiving outside aid. Congress envisaged that the role of the federal government in medical assistance programs should be primarily one of financial support.[22] Within that role, however, it is inevitable that hard decisions must be made as to where funds will be best allocated, and also where federal money will not be profitably spent. We do not think it irrational for Congress to decide that the United States will not bankroll local efforts to provide medical care when it has been determined that those efforts are either misguided or insufficient. It could further be rationally determined that it would not be an efficient allocation of resources for the federal government to assume the state's traditional obligation to provide for the "comfort" of its patients--thereby freeing state funds for other uses--when it has been found, based on past history, that the State would not make effective use of the funds thus freed. If Congress decides that its money is better spent on whatever other projects which it may choose to support, rather than on indirectly subsidizing a State's fiscal appropriations, then we may not disturb that choice.
 
 
 73
 We do not believe that our decision here is at all in conflict with the constitutional principle that punishment must be related to wrongdoing. See Plyler, 457 U.S. at 220, 102 S.Ct. at 2396. We have difficulty with the threshold concept that diverting scarce federal funds to other areas amounts to punishment. Indeed, Congress did not determine that the Patients of TPH were undeserving of a "comfort allowance," but decided only that it was the State which should be expected to provide that benefit. See Wilson, 450 U.S. at 237, 101 S.Ct. at 1084.
 
 
 74
 In Plyler, of course, children of illegal aliens were absolutely barred from receiving the fundamental benefits of a public education because of the alienage of their parents, even though that benefit was universally provided to all other children. The question in Plyler, therefore, was not so much who was expected to provide that benefit, but rather whether it would be provided at all. The Court found that it was irrational to expect that penalizing minor children would have the effect of inducing their parents to conform their conduct to the law. Moreover, it was deemed fundamentally unfair to visit such serious consequences upon children for parental misconduct. Needless to say, the nature of the benefit here, a $25.00 per month "comfort allowance," is qualitatively different from the basic right to public education at issue in Plyler, and the degree of any perceived inequity must there be appropriately adjusted.
 
 
 75
 Moreover, it was not irrational for Congress to assume that the Patients, having lost access to federal assistance due to the State's substandard care, would attempt to transfer to another institution, or else apply pressure upon the State either to provide the comfort allowance itself, or else improve the existing facilities so that federal assistance could be restored. Under any of these possibilities, the results would enure to the ultimate benefit of the Patients themselves. The basically remedial nature of the provision is thus a persuasive factor in finding that it does not impose unconstitutional punishment.
 
 
 76
 We need not agree with Congress' determination on how to spend federal money, or with the reasoning underlying a decision to withhold benefits, in order to reject constitutional attacks on its right to do so. Given the intricate judgments which are always a part of allocating public expenditures, a finding that such an allocation is irrational must be made only in the most unusual of circumstances. We find no such irregularity here, and we therefore uphold the action in withholding the SSI "comfort allowance" from patients in decertified institutions.
 
 VII.
 
 77
 Finally, we turn to the Patients' argument that the Medicare (and thus Medicaid) provisions improperly delegate authority to JCAH, in derogation of Congress' ultimate responsibility to establish federal policy.
 
 
 78
 As the Supreme Court noted in Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed.2d 294 (1892):
 
 
 79
 The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation.
 
 
 80
 Id. at 694, 12 S.Ct. at 505. Accord, Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 55 S.Ct. 241, 248, 79 L.Ed. 446 (1935). Indeed, it has been almost fifty years since the Supreme Court has invoked the doctrine of unconstitutional delegation to void a federal statute,[23] and in Justice Marshall's words, the delegation doctrine is "moribund." FPC v. New England Power Co., 415 U.S. 345, 353-54, 94 S.Ct. 1151, 1156-57, 39 L.Ed.2d 383 (1974) (Marshall, J., concurring and dissenting). We first discuss what functions Congress may properly delegate at all, before we determine whether further reference to a private organization such as JCAH, as opposed to a public agency, further affects the constitutionality of the delegation at issue here.
 
 
 81
 Modern cases have held that, if delegation to an administrative agency is accompanied by an articulation of congressional policy sufficient to safeguard against unbridled administrative discretion, such an assignment of responsibility is constitutional. See Lichter v. United States, 334 U.S. 742, 783, 68 S.Ct. 1294, 1315, 92 L.Ed. 1694 (1948) (statutory reference to "excessive profits" provides a sufficient congressional limitation on administrative power); American Power & Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946) (upholding delegation of authority to SEC to determine when corporate structure was "unduly or unnecessarily complex" or would "unfairly or inequitably distribute voting power among security holders"). The requirement that Congress provide an articulation of policy along with any delegation of authority not only limits agency excesses, but also facilitates the practicality of judicial review of agency action. American Power & Light, 329 U.S. at 106, 67 S.Ct. at 142.
 
 
 82
 We believe that the Medicare and Medicaid Acts provide a sufficient articulation of policy as to what institutions are eligible to participate, such that the actual factual determination as to whether a certain hospital meets the requisite standards may be delegated to an administrative agency. Obviously, it is impractical for Congress to become involved in each decision to certify or not to certify an individual institution. The task of making such findings is one which must be delegated to other agencies if our government is to be allowed to function at all. In this case, the statutory references to "psychiatric hospitals" and to "inpatient hospital services," when viewed against the backdrop of contemporary medical practice, tradition, and understanding, would provide the Secretary with sufficient guidelines, such that administrative regulations giving further definition to those terms are possible without resort to unbridled and uncanalized discretion.[24] We do not understand the Patients to suggest that the responsibility for establishing and applying the specific criteria for hospital certification could not be constitutionally delegated to the Secretary.
 
 
 83
 As we understand the Patients' argument, it is that the Medicare and Medicaid provisions delegates the ultimate responsibility for formulating and applying policy regarding decertification of psychiatric institutions not to the Secretary, but rather to JCAH, a private organization made up of industry representatives. We need not reach the question of whether delegation of such authority to a private entity breaches the constitutional barrier,[25] since our reading of the Medicare statute, which in turn is applicable to the Medicare[26] and Social Security programs, convinces us that the Secretary retains ultimate authority over decertification decisions, through the ability to engage in a "distinct part" survey.
 
 
 84
 As the Patients themselves note, certification for general hospitals is under the primary supervision of the Secretary. 42 U.S.C. Sec. 1395x(e). Pursuant to this responsibility, the Secretary has adopted an extremely comprehensive set of regulations, occupying 32 pages in the Code of Federal Regulations, which sets out the requisite standards for each aspect of a general hospital's operation in order to qualify for participation. 42 C.F.R. Secs. 405.1021-.1035. While JCAH accreditation may, under certain circumstances, independently satisfy the statutory requirements for participation in Medicare, 42 U.S.C. Sec. 1395bb, the Secretary is free to prescribe standards which are higher than those of the Commission, in which case JCAH accreditation would not be effective. 42 U.S.C. Sec. 1395bb(a)(4). Moreover, if the Secretary determines that, despite JCAH accreditation, a particular hospital nevertheless has serious deficiencies, he may, after appropriate notice, decertify the institution. 42 U.S.C. Sec. 1395bb(b). On the other hand, if the Secretary chose to promulgate a standard lower than that of JCAH, a general hospital could presumably be certified by meeting only that lesser standard, even if it did not meet the requirements imposed by the Commission.
 
 
 85
 The Patients argue, however, that in the case of psychiatric hospitals, the statute places JCAH accreditation in a position of ascendancy over approval by the Secretary, thus leading to the question of unconstitutional delegation to a private group. See 42 U.S.C. Sec. 1395x(f)(5). Our reading of the statute leads us to disagree. While Congress did choose to give special attention to JCAH accreditation in the context of psychiatric hospitals,[27] it still provided the "distinct part" survey as a mechanism whereby the Secretary could independently determine whether a particular institution was qualified for participation. Through consecutive or simultaneous distinct part surveys, therefore, it is possible to obtain a de novo evaluation by the Secretary on the adequacy of a hospital's facilities.
 
 
 86
 Nor do we believe that the statute invests JCAH with the power to set policy or determine conclusively the general standards by which all psychiatric hospitals are judged. While 42 U.S.C. Sec. 1395x(f) provides that a distinct part of a psychiatric hospital may be certified "if such distinct part meets requirements equivalent to such [JCAH] accreditation requirements as determined by the Secretary," we do not believe that this requires the Secretary to base his evaluation slavishly on the criteria established by JCAH. The fact that such "equivalence" is to be "determined by the Secretary" gives him discretion to use independent judgment in determining what will be required of psychiatric hospitals. "Equivalent," of course, is a term capable of broad interpretation, and we do not believe that the Secretary is required to subjugate his expertise and judgment to literal or even moderate compliance with the JCAH's definitions of adequacy, if he feels a different standard is appropriate. The reference to JCAH's requirements provides the Secretary with a general guideline that psychiatric hospitals should be on par with contemporary medical standards.[28] We do not think, however, that this reference tethers the Secretary to the JCAH's leash, such that JCAH's promulgated standards must automatically be adopted as the Secretary's standards.
 
 
 87
 We note that the Secretary apparently has also construed section 1395x(f) to give him broad discretion to adopt rules regarding psychiatric hospitals. 42 C.F.R. Sec. 1036(b), adopted by the Secretary, provides:
 
 
 88
 (b) A distinct part of [a psychiatric] institution will be considered to meet requirements equivalent to the accreditation requirements of the JCAH if it is found to be in substantial compliance with the conditions of participation contained in Secs. 405.1020 through 405.1035.
 
 
 89
 (c) In addition, psychiatric hospitals (or distinct parts thereof) must meet the requirements of section 1861(f) of the Act and be in substantial compliance with the conditions of participation contained in Secs. 405.1037 and 405.1038....
 
 
 90
 Thus, the Secretary has referred to his own 32 pages of administrative regulations regarding general hospitals, 42 C.F.R. Secs. 405.1020-.1035--which were promulgated independent of the JCAH--and has determined that they are "equivalent" to JCAH's requirements regarding psychiatric hospitals. Subsumed within this regulation is an assumption by the Secretary that section 1395x(f) does not preclude the adoption of standards which were not derived from the criteria established by the JCAH. Especially in light of the above discussion, we do not think this interpretation by the Secretary to be unreasonable.
 
 
 91
 We therefore conclude that the Secretary has the authority to make findings regarding the adequacy of a psychiatric hospital independent of the JCAH, and also has the authority to establish his own general standards by which those determinations are made. Since, in effect, all actions of JCAH are subject to full review by a public official who is responsible and responsive to the political process, we find that there has been no real delegation of authority to JCAH.[29] See Todd & Co. v. SEC, 557 F.2d 1008 (3d Cir.1977) (where actions of private organizations were subject to review by wholly public body, no unconstitutional delegation has occurred). We therefore affirm the district court in granting judgment to the defendants on this issue.
 
 VIII.
 
 92
 Because we find that the Patients have stated no constitutional violations in connection with the loss of their federally funded benefits, the judgment of the district court will be affirmed.[30] Each party shall bear its own costs.
 
 
 93
 BECKER, Circuit Judge, dissenting.
 
 
 94
 There are two constitutional provisions that, in my view, require the Secretary to award unpaid SSI benefits to the elderly mental patients confined at Trenton Psychiatric Hospital whose benefits were terminated because of the refusal of the Joint Committee on Accreditation of Hospitals to accredit that institution.[1] First, I believe that the statutory and regulatory scheme under which the JCAH, a private body, terminated these benefits amounted to an unconstitutional delegation of legislative and adjudicatory power to a private body. Second, I believe that the statutory and regulatory scheme violates the due process clause of the fifth amendment. It irrationally denies SSI benefits to those helpless souls, confined through no fault of their own in psychiatric hospitals deemed inadequate, while awarding benefits to those similarly situated, but confined in "better" hospitals; moreover, the denial of SSI benefits to these incarcerated mental patients places little, if any, pressure on their guardians to improve conditions. For these reasons, the asserted basis for the statutory and regulatory scheme does not rise to even the minimal level of rationality required by the Constitution. Cf. Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). I treat these issues in turn.
 
 I.
 
 95
 When we heard this case in January, the delegation issue was of significant importance, both practically and doctrinally. In the interim, however, the statutes in question have been amended--perhaps because of the constitutional concerns I identify today--to eliminate JCAH certification as a condition for receipt of various social security benefits by mental patients. See Deficit Reduction Act of 1984, Pub.L. No. 98-369 Sec. 2340 (July 18, 1984).[2] I thus keep my dissenting remarks on this point reasonably brief.
 
 
 96
 Under the statute in effect at the time benefits at issue here were terminated, the JCAH was not accountable to either the government or the individuals most affected by its decisions. It might "define" a "psychiatric hospital" however it chose, and might use whatever procedures it wished in developing that definition. Nothing required the members of the JCAH (or those to whom it in turn delegated responsibility) to listen to opposing viewpoints, and the JCAH regulations were not subject to judicial or administrative review to uncover substantive or procedural shortcomings. The JCAH's freedom to apply its regulations to individual hospitals was also unfettered; the JCAH was not required to use any specific procedures in its evaluation of individual hospitals, nor was there any provision for administrative or judicial review of those "adjudicatory" procedures.
 
 
 97
 The majority makes a valiant effort to interpret the statutes under attack here in order to save them. It says that because any hospital denied JCAH certification could seek accreditation through simultaneous "distinct part" surveys, legislative and adjudicatory authority was not unconstitutionally delegated to a private body.[3] The majority's understanding of the provisions for "distinct part" surveys, which is critical to the majority's disposition of the delegation claim, is that the Secretary can correct adjudicatory errors in the JCAH's application of its own regulations to a particular hospital, and can also correct problems with the JCAH's rules themselves. As the majority phrases it, the Secretary's regulations in evaluating an institution to determine whether it is a psychiatric hospital need not even be "in moderate compliance with the JCAH's definition of adequacy." Majority opinion, at 88. The problem with this analysis is that the plain words of the statute that allow for distinct part certification require that "such distinct part meets requirements equivalent to [those required for JCAH] accreditation." 42 U.S.C. Sec. 1395x(f) (1982) (emphasis added). In my view, however, "equivalent" means equivalent; it does not, as the majority seems to suppose, mean whatever the Secretary wishes it to mean, or generally refer to things that are quite dissimilar.[4]
 
 
 98
 The clear import of the statutory language is that psychiatric hospitals may be accredited through a "distinct part survey" conducted by the Secretary of HHS according to regulations that are the "equivalent" of JCAH regulations, but that Congress intended to protect hospitals from only erroneous or (perhaps) procedurally defective applications of the regulations. Congress did not provide any remedy for problems with the substantive regulations or the procedures by which they were adopted.[5] It is this failure, which the majority fails to recognize, that concerns me. I thus turn to the merits of the delegation claim.
 
 
 99
 In many areas, the courts have historically allowed private bodies to exercise authority which could be characterized as amounting to a deprivation of a property or liberty interest. See generally, Note, The State Courts and Delegation of Public Authority to Private Groups, 67 Harv.L.Rev. 1398, 1399 (1954). Family law provides a familiar example. See Parham v. J.R., 442 U.S. 584, 602-03, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101 (1979); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). And it is also true that, even in areas traditionally thought of as belonging in the realm of public rather than private decision-making, courts have tolerated broad delegation of law-making power to private bodies. See Todd & Co., Inc. v. SEC, 557 F.2d 1008 (3d Cir.1977). There comes a point, however, where concerns about the fairness of decision-making that affects the interests of individuals in public benefits must outweigh the need for uncanalized exercises of "expertise."[6] Absent exigent circumstances not present here, courts should not permit Congress to delegate to private bodies, that are not required by statute to listen to affected parties in making their regulations, and whose regulations are not subject to review under the Administrative Procedure Act or any other federal or state statute, the right to take actions in areas of traditional public law that seriously affect individuals' rights, especially those of perhaps the most powerless group in this nation: the elderly handicapped. In my opinion, the delegation of authority in this case to the JCAH reached that impermissible point.[7]II.
 
 
 100
 I would also direct the Secretary to award back benefits to the elderly patients confined at Trenton Psychiatric Hospital on grounds that the statutory scheme under which their benefits were terminated--a scheme that can most charitably be described as labyrinthine (but more accurately as a tragic accident, cf. Schweiker v. Wilson, 450 U.S. 221, at 244, 101 S.Ct. 1074, at 1087, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting))--is so irrational as to violate the due process clause of the fifth amendment in both its "substantive" and "equal protection" components.
 
 
 101
 I agree with the majority that, either under a substantive due process approach or under an equal protection approach, the statutes in question must be upheld if there is a rational basis and that, "[g]iven the intricate judgments which are always a part of allocating public expenditures, a finding that such an allocation is irrational must be made only in the most unusual circumstances." Majority Opinion at 86. Unlike the majority, however, I have great trouble in finding even a scintilla of rationality in providing comfort benefits to inmates of psychiatric hospitals found to meet appropriate standards, but to deny those benefits to inmates in psychiatric hospitals found substandard. Cf. Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The majority characterizes this legislation as "perhaps harsh." In my view, the legislation is extraordinarily harsh. The absence of economic resources needed to participate in the market leaves these confined patients wholly in the control of their institutional keepers. According to testimony adduced before the district court, the comfort allowances were used, among other things, to save for occasional visits home that otherwise would not have been possible. As Judge Feinberg observed in Koe v. Califano, 573 F.2d 761, 763 n. 5 (2d Cir.1978), "SSI payments make possible the purchase of items essential to any human existence transcending bare subsistence. The loss of such payments imposes a readily understandable burden; less obvious but perhaps no less significant are the uncertainty and feelings of rejection inflicted by the continuous threat of deprivation on those who have so little and are mentally ill." There is considerable evidence in this record that supports Judge Feinberg's comments as to the psychologically detrimental effect of cutting off these benefits. Cf. Vecchione v. Wohlgemuth, 377 F.Supp. 1361, 1367-68 (1974).
 
 
 102
 The majority appears to justify the statutes in question on grounds that, because psychiatric hospitals have had a history of abuse and neglect, their accreditation must be undertaken carefully. While I cannot quarrel with this generalization, I believe it misses the point. The issue is not simply the propriety of special standards for certification of psychiatric hospitals; the issue is the propriety of the consequences imposed by Congress on those incarcerated in psychiatric hospitals that are found to be substandard. It is only when dealing with the equal protection issue that the majority faces up to this more difficult aspect of the case before us.
 
 
 103
 Unfortunately, the justifications provided by the majority make little sense. According to the majority, Congress could rationally believe that federal revenues should not "bankroll local efforts" or supplant the "state's traditional obligation to provide for the 'comfort' of its patients" when "it has been determined that [the state's] efforts are either misguided or insufficient," or that the State would not make effective use of the funds thus freed. As presented, however, this justification is fatally incomplete. In the effort to complete its justification, therefore, the majority suggests two theories. First, Congress could "assume" that deprived patients at the unaccredited hospitals would attempt to transfer to other institutions. Second, the patients might pressure the state either to replace the lost benefits or to better adapt its substandard institutions to the demands of the JCAH.
 
 
 104
 Both of the alternatives by the majority in its effort to save its thesis are less than fully persuasive. To take the easier target first, the notion that elderly confined psychiatric patients might pressure the state is just unrealistic. Moreover, Congress did not need to "assume" that patients would be able to transfer to other hospitals. Congress could have taken steps to encourage states to allow transfers or could have terminated benefits to patients confined at substandard psychiatric hospitals only where transfers were allowed.[8] Given the low level of scrutiny applicable to the statutes in question here, however, perhaps the majority is right in permitting Congress to make this assumption. My point is simply that we ought not be so quick or so enthusiastic in embracing invented justifications of such suspect character.
 
 
 105
 The more telling flaw with the majority's analysis, however, is the injustice which results from depriving the wards (the patients) of benefits because their guardians (the substandard institution) are incompetent. As the Supreme Court recognized in Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), it is seldom rational to visit the sins of the parents upon their child. The majority again seeks to evade the problems implicit in this case and the learning of Plyler v. Doe by arguing that deprivation of the comfort benefits is not "punishment," because the money freed will presumably help others. But nothing in Plyler turned on the "punitive" nature of the deprivations involved. Moreover, there was simply no argument in Plyler that the deprivation of an education to the children of illegal aliens was any less a deprivation or "punishment" because Texas could use the money for other public programs.
 
 
 106
 Indeed, perhaps the only rational basis for such a system is the belief that the termination will spur the parent or guardian to improve itself so that the child or ward will be aided. While such a belief may have a rational basis in some instances, it strains credulity here. If the state does not care enough about its psychiatric patients to provide them with an adequate facility, why would it seek to improve itself when the federal government terminated certain benefits to the patients? The procedure is as irrational as a program that would cut off a child's subsidized lunches because its parents abused and neglected the child. And the majority's suggestion that New Jersey will supply the deprived comfort money seems most unrealistic. Cf. Schweiker v. Wilson, 450 U.S. at 246, 101 S.Ct. at 1089 (Powell, J., dissenting).
 
 
 107
 In downplaying the problems I have identified, the majority relies heavily on the approach of Schweiker v. Wilson, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). I concede that Schweiker does not require much in the way of rationality for the government to allocate funds, but it does not, in my view, necessitate or justify the result reached by the majority in this case. Schweiker dealt with the group not involved in this case, confined mental patients 18 to 64 years of age, and upheld that portion of the regulatory scheme at issue here that deprived that group of comfort money on the basis of age and residence in a public mental institution not receiving Medicaid funds for their care. The majority of the Court took that view that, in this area of low level scrutiny and the predominant interest and responsibility of the state in providing for the mentally ill, there was no reason to subject the congressional judgment as to the expenditure of federal funds to constitutional restraint.[9] But Schweiker was a 5 to 4 decision, with a powerful dissent by Justice Powell, and I do not believe that the court would extend its result in a case where the problems recognized in the 1982 Plyler decision are added to those considered in Schweiker.
 
 
 108
 In his Schweiker dissent, Justice Powell observed:
 
 
 109
 But, it is argued, Congress rationally could make the judgment that the States should bear the responsibility for any comfort allowance, because they already have the responsibility for providing treatment and minimal care. There is no logical link, however, between these two responsibilities. See U.S. Dept. of Agriculture v. Murry, supra. Residence in a public mental hospital is rationally related to whether the Congress should pay for the patient's treatment. Legion v. Richardson, 354 F.Supp. 456 (SDNY), summarily aff'd sub nom. Legion v. Weinberger, 414 U.S. 1058 [94 S.Ct. 564, 38 L.Ed.2d 465] (1973). The judgment whether the Federal Government should subsidize care for the mentally ill in large public institutions involves difficult questions of medical and economic policy. Supra [, 450 U.S. at 241-42, 101 S.Ct.] at 1086. But residence in a public mental institution, as opposed to residence in a state medical hospital or a private mental hospital, bears no relation to any policy of the SSI program. The monthly $25 allowance pays for small personal expenses, beyond the minimal care and treatment provided by Medicaid or "other programs." H.R.Rep. No. 96-451, pt. 1, p. 153 (1979). If SSI pays a cash benefit relating to personal needs other than maintenance and medical care, it is irrelevant whether the State or the Federal Government is paying for the maintenance and medical care; the patients' need remains the same, the likelihood that the policies of SSI will be fulfilled remains the same.
 
 
 110
 450 U.S. at 246-47, 101 S.Ct. at 1089. When one adds to these powerful considerations the facts that the patients in this case are unable to transfer or effectively to pressure the institutions to upgrade their care; that the deprivations involved are solely based on the shortcomings of the institutions, thus raising Plyler v. Doe problems; and that the "rationale" suggested to uphold the scheme is not apparent from the actions of Congress but rather is an ex post construction of government attorneys, I do not believe that the Schweiker rationale should be extended to this case. In short, the statutory scheme is too irrational to be upheld under the fifth amendment.
 
 
 111
 I respectfully dissent.
 
 
 
 [1]
 Before 1973, TPH was surveyed according to the standards for "acute care hospitals."
 
 
 [2]
 In 1978, these councils were abolished in favor of Professional and Technical Advisory Committees, but the accreditation program remained
 
 
 [3]
 JCAH asserts that any individual or group, including patients, interested in the accreditation of a facility may request an interview with the surveyors to present information or recommendations bearing on the facility's fitness for accreditation. Notice of the opportunity to request such interviews must be posted by the facility in a public place several weeks in advance of the survey
 
 
 [4]
 42 U.S.C. Sec. 1382(e)(1) provides:
 (1)(A) Except as provided in subparagraphs (B), (C), and (D), no person shall be an eligible individual or eligible spouse for purposes of this subchapter with respect to any month if throughout such month he is an inmate of a public institution.
 (B) In any case where an eligible individual or his eligible spouse (if any) is, throughout any month, in a hospital, extended care facility, nursing home, or intermediate care facility receiving payments (with respect to such individual or spouse) under a State plan approved under subchapter XIX of this chapter, the benefit under this subchapter for such individual for such month shall be payable--
 (i) at a rate not in excess of $300 per year (reduced by the amount of any income not excluded pursuant to section 1382a(b) of this title) in the case of an individual who does not have an eligible spouse;
 
 
 [5]
 The district court below remanded to the Appeals Council of the Social Security Administration for restoration of lost benefits to residents of the Children's Unit. Indeed, neither the Secretary nor JCAH dispute that such benefits should be restored. Joint Brief of Appellees at 24. At oral argument, counsel for the appellees stated that, at this point, the only difficulty in repaying those benefits was that many former patients could not be located, and thus the Appeals Council could not act. Subsequent to oral argument, however, we granted the Secretary's motion to supplement the record to show that, on April 26, 1984, the Appeals Council retroactively restored benefits to all 44 past or present residents of the Children's Unit who are plaintiffs in this action. Thus, full relief has been accorded as to this issue and we agree with the Secretary and JCAH that this aspect of the present appeal is now moot. See infra Part III
 
 
 [6]
 They also sought a declaratory judgment as to whether JCAH engaged in state action, and whether JCAH was a statutory agency of the government within the meaning of the Administrative Procedure Act, 5 U.S.C. Sec. 551. The Patients have not pursued these last two arguments on appeal, and we have no occasion to consider them
 
 
 [7]
 Earlier in the proceedings, the defendants JCAH and the Secretary sought to have the case dismissed for lack of subject matter jurisdiction, arguing that 42 U.S.C. Sec. 405(h) precluded the court's jurisdiction to consider the Patient's constitutional claims unless they exhausted their administrative remedies. The district court found, however, that it had jurisdiction to hear the constitutional issues presented. Cospito v. Califano, 89 F.R.D. 374 (D.N.J.1981)
 
 
 [8]
 The district court's order also denied the defendants' motion to dismiss the Patients' complaint on the grounds of standing, and denied the Patients' motion for summary judgment against JCAH on the issue of whether the deaccreditation by JCAH constituted "state action." The court further granted summary judgment in favor of the defendants as to whether JCAH constituted a "federal agency." The Patients take no appeal from these orders
 Although JCAH had all claims against it dismissed, it took a protective cross-appeal to preserve its contention, rejected by the district court, that the Patients had no standing. See infra note 30. Indeed, it may not even have been necessary to file such a cross-appeal to preserve this issue, since JCAH has asserted no more than a defense of the judgment in its favor. See Scott v. University of Delaware, 601 F.2d 76, 82 n. 12 (3d Cir.), cert. denied sub nom. Estate of Scott v. University of Delaware, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); id. at 90-92 (Adams, J., concurring). In addition, "a prevailing party can support a district court judgment on any ground, including ones overlooked or rejected by the trial court." Washington Steel Corp. v. TW Corp., 602 F.2d 594, 600 (3d Cir.1979). See Lucas v. Gulf & Western Indus., 666 F.2d 800, 805 (3d Cir.1981); Reserve Insurance Co. v. Brokerage Surplus Corp., 570 F.2d 487, 491 (3d Cir.1978); Hilton v. Mumaw, 522 F.2d 588, 603 (9th Cir.1975).
 As a final procedural preface, we note that the Patients moved to amend their complaint to include two new issues: (1) whether JCAH improperly "supra-delegated" authority to its parent organizations, and (2) whether JCAH engaged in anticompetitive practices in violation of antitrust law. Because this motion was made five years after the original complaint was filed, the district court denied permission to amend, on the same date that it dismissed the rest of the claims against the defendants. App. at 68-72. No appeal was taken from that denial. All aspects of this controversy have therefore been finally determined by the district court, and we have appellate jurisdiction. 28 U.S.C. Sec. 1291.
 
 
 [9]
 Although the opinion of the district court stated that all claims would be dismissed, the actual order entered merely granted summary judgment on each of the substantive issues which the Patients raised, e.g., procedural due process, equal protection, etc. Nevertheless, the result of that order, even if read apart from the accompanying opinion, amounted to a total rejection of the Patients' action, and neither side contends that the order does not dismiss the claims, as the opinion said it would. Such an order is final for purposes of appellate jurisdiction. See Bankers Trust v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (per curiam)
 
 
 [10]
 Because the claims involving the Children's Unit is moot, we do not need to determine whether JCAH accreditation is the only means by which a psychiatric hospital for minors may be certified under Medicaid, or whether certification is possible through a "distinct part" survey
 
 
 [11]
 "No person shall ... be deprived of life liberty, or property, without due process of law ...." U.S. Const., 5th am
 
 
 [12]
 Some of the named plaintiffs are voluntarily committed. These patients, however, can be temporarily retained against their will while involuntary commitment procedures are underway. N.J.Stat.Ann. 30:4-46 to 48
 
 
 [13]
 N.J.Ct.R. 4:74-7(f) requires that a judgment of civil commitment specify the particular institution to which the patient is to be sent. See Pressler, Current N.J. Court Rules, Comment 7 to R. 4:74-7
 N.J.Stat.Ann. 30:4-83 provides that inmates of charitable institutions may be transferred to another institution upon the initiative of the Commissioner of Institutions and Agencies. The Patients, however, adduced evidence which, if credited, would show that, as a practical matter, the transfer process took years to complete, and indeed many patients have to this day been unable to transfer out of TPH.
 
 
 [14]
 The Medicaid Act provides that a State plan must:
 (1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them:
 ....
 (8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.
 42 U.S.C. Sec. 1396a. If a State chooses to participate in Medicaid, therefore, it appears that eligible patients have a legitimate claim of entitlement to be able to avail themselves of Medicaid benefits at some institution within the State.
 
 
 [15]
 Town Court did not itself articulate a general test to distinguish between "direct" and "indirect" effects of government action. See O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 793-94, 100 S.Ct. 2467, 2479-80, 65 L.Ed.2d 506 (Blackmun, J., concurring). Under other circumstances, it might have been necessary to develop further analysis in order to make such a determination. See generally Terrell, "Property," "Due Process," and the Distinction Between Definition and Theory in Legal Analysis, 70 Geo.L.J. 861 (1982). Because this case is factually indistinguishable from Town Court, however, the Supreme Court's determination that the withdrawal of federal benefits from patients in a decertified facility is merely an "indirect" result of government action controls, and we are constrained to follow that mandate
 
 
 [16]
 This reasoning, of course, does not affect whatever claim the Patients might have against the State of New Jersey. Since the State is not a defendant here, we have no opportunity to address that question
 
 
 [17]
 The district court granted summary judgment on the procedural due process claim for the reason that, in its opinion, the procedures used adequately safeguarded the Patients' interests. App. at 87. Applying the tests of Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the court found that there was a "virtual identity of interest" shared between the Patients and TPH, such that it would be of little practical value to require that the Patients participate in the accreditation process separate and apart from the hospital itself. App. at 88. See also Town Court, 447 U.S. at 797, 100 S.Ct. at 2481 (Blackmun, J., concurring)
 Without disagreeing with the district court's reasoning, we note that our analysis makes it unnecessary to reach the issues addressed by the court below, since we find that due process protections are not implicated here.
 
 
 [18]
 In Town Court, for instance, the decertification of the nursing home by the Secretary was not due to deaccreditation by JCAH. Rather, the Pennsylvania Department of Public Welfare revoked the home's license, which resulted in decertification. See 42 U.S.C. Sec. 1395x(j)(9); cf. 42 U.S.C. Sec. 1395x(e)(7)
 
 
 [19]
 The Supreme Court has reserved the question of whether legislation expressly classifying mental patients as a discrete group must be examined under any enhanced standard of scrutiny. Schweiker v. Wilson, 450 U.S. 221, 231 n. 13, 101 S.Ct. 1074, 1081 n. 13, 67 L.Ed.2d 186 (1981)
 
 
 [20]
 See Mental Retardation Facilities and Community Mental Health Centers Construction Act, Pub.L. No. 88-164, 77 Stat. 282 (1963), codified as amended at 42 U.S.C. Secs. 2670-2697b. Congress has further evidenced its continuing concern for the welfare of the developmentally disabled in the Developmentally Disabled Assistance and Bill of Rights Act of 1975, amending 42 U.S.C. Secs. 6000-6106a
 Indeed, the ramifications of conditions in mental hospitals are also well-known to this court. See, e.g., Halderman v. Pennhurst State Hospital, 673 F.2d 647 (3d Cir.1982) (en banc), rev'd & remanded, --- U.S. ----, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); Romeo v. Youngberg, 644 F.2d 147 (3d Cir.1980) (en banc), vacated and remanded, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); cf. Rennie v. Klein, 720 F.2d 266 (3d Cir.1983) (en banc).
 
 
 [21]
 As noted previously, the Medicaid statute itself merely states that medical assistance shall be provided for "inpatient hospital services" for patients over 65. 42 U.S.C. Sec. 1396d(a)(14). It does not, however, explicitly state what qualifies as "inpatient hospital services," either by reference to JCAH accreditation or by some other criteria adopted by the Secretary. That definition is contained only in 42 C.F.R. Sec. 440.140(a)(2), which provides that the eligibility of an institution for Medicaid shall be determined under the same standards as eligibility for Medicare. Thus, the Patients ultimately lost their "comfort allowance" because TPH did not qualify under Medicare, thus disqualifying it from participation in Medicaid, which in turn resulted in the Patients' ineligibility under the Social Security program
 The fact that the initial link between eligibility under Medicare and Medicaid was created by administrative regulations and not by statute does not undermine the legal result that TPH is ineligible under Medicaid (thus precluding SSI benefits for the Patients). As the Supreme Court has most recently reminded us in Chevron v. Natural Resources Defense Council, --- U.S. ----, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), judicial review of administrative regulations promulgated under an act of Congress is limited to the narrow inquiry of whether those regulations are a "reasonable" interpretation or explanation of the statute. We think it eminently reasonable that, in determining whether an institution provides qualified "inpatient hospital services" under Medicaid, the Secretary should rely on criteria which Congress itself adopted for use in the companion Medicare program. To deny the Secretary this power would create a hiatus in the legislative scheme which would put into limbo the definition of qualified "inpatient hospital services."
 
 
 [22]
 Indeed, Congress forbade the federal government from assuming an active role in the supervision of the actual practice of medicine or the manner in which medical care is provided. 42 U.S.C. Sec. 1395
 
 
 [23]
 See Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (both cases striking down provision giving force of law to code established by industry associations)
 
 
 [24]
 Furthermore, we do not believe it constitutionally improper for Congress to delegate the general task of establishing the technical criteria by which a psychiatric hospital is to be judged. Congress' function in establishing federal policy does not impose upon it the responsibility to become professionally expert in every imaginable field in which the federal government has an interest. No legislature, however industrious, can be expected at one time to acquire collectively the knowledge of a physician, engineer, banker, pharmacologist, environmentalist, geologist, etc. It would simply be impractical for Congress to attempt itself to delineate the myriad of medical, technological, logistical, and sociological considerations which are part of the determination of a hospital's competence
 Even if we assume that Congress might educate itself sufficiently on the technical details of what constitutes a medically acceptable hospital so as to try its hand at establishing the specific criteria for certification, we note that the practice of medicine is an ever-evolving and advancing field. Any set of specific regulations which Congress might produce would run the risk of becoming obsolete within a short time, thus needlessly spinning legislative wheels. We therefore conclude that both the establishment of technical criteria for the certification of psychiatric hospitals, and the application of those criteria to a particular setting, are tasks which are particularly apt for delegation to an administrative agency, and that such a delegation is constitutionally sound.
 
 
 [25]
 Historically, the Supreme Court expressed an antipathy to the delegation of policy-making responsibility to private organizations. See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 537, 55 S.Ct. 837, 846, 79 L.Ed. 1570 (1935); see also Washington ex rel. Seattle Title & Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928). It has been suggested that the continued vitality of these cases is suspect. See FPC v. New England Power Co., 415 U.S. 345, 353, 94 S.Ct. 1151, 1156, 39 L.Ed.2d 383 (1974) (Marshall, J., concurring and dissenting); L. Tribe, American Constitutional Law Sec. 5-18, p. 291 (1978). Nevertheless, we need not take issue with the holding of Schechter here, since we find that there was in fact no delegation of real authority to JCAH
 We note that even Schechter, which is perhaps the furthest extension of the hostility to delegations of authority to nonpublic organizations, acknowledges that Congress may seek private assistance in "matters of a more or less technical nature." 295 U.S. at 537, 55 S.Ct. at 846. See supra note 24.
 
 
 [26]
 See supra note 21
 
 
 [27]
 The legislative history reveals that Congress intended "to support the efforts of the various professional accrediting organizations sponsored by the medical and hospital associations, ..." S.Rep. No. 404, 89th Cong., 1st Sess., reprinted in 1965 U.S.Code Cong. & Ad.News 1943, 1969
 
 
 [28]
 As we have noted, when Congress delegates authority it must give an administrative agency some guidance as to how that authority is to be used
 
 
 [29]
 Our resolution of this issue renders somewhat academic the Patients' contention that it was improper for JCAH to "subdelegate" the responsibility for evaluating psychiatric hospitals to the various accreditation councils. Since we have found that no real authority was actually vested in JCAH, it follows that there could be no improper "subdelegation" of authority to divisions of the Commission
 Furthermore, we doubt that Congress intended that the 22 member Board of Commissioners, JCAH's governing body, personally perform each accreditation inspection of every hospital throughout the country. Naturally, the initial work of inspection and collection of data must be left to staff appointed by the Board. We also note that the Board of Commissioners retains final review of all accreditation decisions.
 
 
 [30]
 Our disposition renders moot the protective cross-appeal filed by JCAH, in whose brief the Secretary joined. Thus, we dismiss the appeal at 83-5202. See supra note 8
 
 
 [1]
 I agree with the majority that the claim of the under 21-year old plaintiffs is now moot
 
 
 [2]
 Under the new law, in order to be a "psychiatric hospital," an institution must meet the more objective requirements of 42 U.S.C. Sec. 1395x(f)(1)-(4), except (apparently) if, pursuant to the revised 42 U.S.C. Sec. 1395bb(a) the "Secretary finds that accreditation of an entity by ... any rational accreditation body provides reasonable assurance that any or all of the conditions of ... [42 U.S.C. Sec. 1395x(f) ] are met, he may, to the extent he deems it appropriate, treat such entity as meeting the condition or conditions with respect to which he made such finding." Thus, JCAH accreditation of Trenton Psychiatric Hospital might render that institution a "psychiatric hospital," but a refusal to accredit would not appear to have the preclusive effect that it did prior to enactment of the Deficit Reduction Act of 1984
 
 
 [3]
 Incidentally, it appears that the distinct part survey route to accreditation of an entire institution has never been attempted, and its utility or even availability seems more theoretical than real
 
 
 [4]
 Indeed, an appropriate plaintiff might be able to challenge under the Administrative Procedure Act any regulations defining a "psychiatric hospital" that were not "the equivalent" of JCAH regulations
 
 
 [5]
 The concern is the same whether or not the JCAH itself decided to allow broad participation in its rule-making procedures, which it apparently did not, and which was the subject of the plaintiffs' justifiable complaint. While broad participation might eliminate some concerns, it was not required by Congress. For a critical account of JCAH accreditation procedures, see "TPH Accreditation: Paperwork Outweighs Therapy," Trenton Times, July 2, 1984, at 1
 
 
 [6]
 It is, of course, true that, if the private body goes too far beyond the pale or behaves improperly in the exercise of its delegated authority, Congress can--just as it has done here--withdraw the delegation. This theory would allow all delegations, as consistent with a theory of a government responsible to the people, because the people's representatives retain ultimate control. The problems with the theory are also obvious
 
 
 [7]
 To reach the conclusion that the statutory scheme is an unconstitutional delegation, I must, of course, deny defendant's cross-appeal from the failure of the district court to grant summary judgment because of the patients' alleged lack of standing to bring this suit. Defendants argue that TPH would not have qualified as a psychiatric hospital under the relevant statutes even if the JCAH had accredited it. Assuming arguendo that this argument has theoretical validity, see Doherty v. Rutgers School of Law, 651 F.2d 893 (3d Cir.1981), disputed issues of material fact remain. Summary judgment would thus have been inappropriate. Defendants also argue based on Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), that, because TPH's participation in the programs involved here is voluntary, JCAH accreditation might not ameliorate the injury claimed by the patients. I would reject this argument. Simon does not hold that the plaintiffs must prove to a certainty that the relief sought will cure the ill complained of. Rather, for constitutional standing to be absent, the likelihood of redress must be "remote" or "purely speculative." Defendants finally argue that the plaintiffs have not been injured because other entities are responsible for assuring plaintiffs' welfare and because these entities do not thereby acquire any claim against the plaintiffs. Disputed issues of fact remain on this claim; summary judgment would thus be inappropriate
 
 
 [8]
 I note that the record suggests that the plaintiffs here could not transfer to other institutions. Congress could have conditioned the receipt of any aid to the state on the ability of the patients to transfer. Arguably, of course, the proposed solution might only exacerbate the problem. Patients in states with poor hospitals that refused to transfer patients out of those hospitals and who would thus be arguably even worse off would be denied aid whereas patients in states that "only" temporarily deprived their patients of adequate care would receive benefits. All of this simply points out the larger problem of making a patient's receipt of aid dependent on the quality of the institution in which he or she is confined. See infra
 
 
 [9]
 This case, of course, deals with the group entitled to the funds under the statute that denied benefits to the plaintiffs in Schweiker