RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0346p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

STATE OF OKLAHOMA; OKLAHOMA HORSE RACING COMMISSION; TULSA COUNTY PUBLIC FACILITIES AUTHORITY, dba Fair Meadows Racing and Sports Bar; STATE OF WEST VIRGINIA; WEST VIRGINIA RACING COMMISSION; HANOVER SHOE FARMS, INC.; OKLAHOMA QUARTER HORSE RACING ASSOCIATION; GLOBAL GAMING RP, LLC, dba Remington Park; WILL ROGERS DOWNS, LLC; UNITED STATES TROTTING ASSOCIATION; STATE OF LOUISIANA,

          *Plaintiffs-Appellants*,

    *v.*

UNITED STATES OF AMERICA; HORSERACING INTEGRITY AND SAFETY AUTHORITY, INC.; LEONARD S. COLEMAN, JR.; NANCY M. COX; FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as the Chair of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission; STEVE BESHEAR; ADOLPHO BIRCH, JR.; ELLEN MCCLAIN; CHARLES P. SCHEELER; JOSEPH DEFRANCIS; SUSAN STOVER; BILL THOMASON; D. G. VAN CLIEF,

          *Defendants-Appellees*.

> No. 22-5487

─────────────

On Remand from the United States Supreme Court

United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:21-cv-00104—Joseph M. Hood, District Judge.

Argued: November 12, 2025

Decided and Filed: December 17, 2025

Before: SUTTON, Chief Judge; COLE and GRIFFIN, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Lochlan F. Shelfer, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. Courtney L. Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Pratik A. Shah, AKIN GUMP STRAUSS HAUER &

FELD LLP, Washington, D.C., for Horseracing Authority Appellees.  **ON SUPPLEMENTAL BRIEF:**  Lochlan F. Shelfer, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Zach West, OFFICE OF THE OKLAHOMA ATTORNEY GENERAL, Oklahoma City, Oklahoma, Michael R. Williams, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, Joseph Bocock, BOCOCK LAW PLLC, Oklahoma City, Oklahoma, Todd Hembree, CHEROKEE NATION BUSINESSES, Catoosa, Oklahoma, Elizabeth B. Murrill, LOUISIANA DEPARTMENT OF JUSTICE, Baton Rouge, Louisiana, Michael Burrage, WHITTEN BURRAGE, Oklahoma City, Oklahoma, Jared C. Easterling, GREEN LAW FIRM PC, Ada, Oklahoma, for Appellants.  Courtney L. Dixon, Caroline W. Tan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Pratik A. Shah, Lide E. Paterno, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., John C. Roach, RANSDELL ROACH & ROYSE, Lexington, Kentucky, for Horseracing Authority Appellees.  **ON SUPPLEMENTAL AMICUS BRIEF:**  Sarah Sloan Reeves, Adam Clay Reeves, STOLL KEENON OGDEN PLLC, Lexington, Kentucky, Paul E. Salamanca, Lexington, Kentucky, Aaron M. Streett, BAKER BOTTS L.L.P., Houston, Texas, for Amici Curiae.

————————

## OPINION

————————

SUTTON, Chief Judge.  Sometimes government works.  And sometimes it works best after a dialogue between and within the various branches.

In 2020, Congress enacted the Horseracing Integrity and Safety Act to establish a nationwide framework for regulating thoroughbred horseracing.  That led to several non-delegation and anti-commandeering challenges to the validity of the Act throughout the country. The lead challenge—the facial non-delegation challenge—focused on the reality that the Act replaced several state regulatory authorities with a private corporation, the Horseracing Authority, which became the Act's primary rulemaker and which was not subordinate to the relevant public agency, the Federal Trade Commission, in critical ways.  The first circuit to assess the validity of the law, the Fifth Circuit, declared the Act facially unconstitutional because it gave "a private entity the last word" on federal law.  *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Black I*), 53 F.4th 869, 872 (5th Cir. 2022); *see id.* at 888–89.

In response to the Fifth Circuit's decision and after oral argument in a similar case in our circuit, Congress amended the Act to give the Federal Trade Commission discretion to

"abrogate, add to, and modify" any rules that bind the industry. Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, 5231–32 (2022). While the Constitution does not require constructive exchanges between Congress and the federal courts, it does not discourage them either, and good government sometimes benefits from them. *Mistretta v. United States*, 488 U.S. 361, 408 (1989). A productive dialogue occurred in this instance, and, from our perspective, it ameliorated the concerns underlying the non-delegation challenge. In *Oklahoma v. United States*, we upheld the Act against a facial non-delegation challenge and an anti-commandeering challenge. 62 F.4th 221, 225 (6th Cir. 2023). The Eighth Circuit took the same view. *Walmsley v. FTC*, 117 F.4th 1032, 1038–40 (8th Cir. 2024). The Fifth Circuit agreed with both courts with respect to the rulemaking power created by the Act. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Black II*), 107 F.4th 415, 420 (5th Cir. 2024). But it facially invalidated the law on the ground that the Act afforded the Horseracing Authority the power to enforce federal law "without the FTC's say-so." *Id.* at 421. The losing parties all filed petitions for writs of certiorari in the Supreme Court.

The Supreme Court held the various petitions while it considered a separate non-delegation challenge to another federal law that used a private entity in implementing the law. In *FCC v. Consumers' Research*, the Court considered an as-applied challenge to the Federal Communications Commission's Universal Service Fund, premised on the reality that the FCC relied on a private administrator's policy recommendations in administering the program. 606 U.S. 656 (2025). The Court ruled that the program did not impermissibly delegate government authority to a private entity because the FCC retained final "decision-making authority." *Id.* at 693. After its decision, the Court "GVR'd" the three certiorari petitions raising non-delegation challenges to the Horseracing Integrity and Safety Act. That is to say, the Court granted each petition, vacated the lower court judgments, and remanded the cases for reconsideration in light of *Consumers' Research*.

That brings us to our second look at the Act. In view of the guidance provided by the Supreme Court in *Consumers' Research* and other recent decisions, we reject this facial challenge because the Act, as amended, gives the FTC, not the Horseracing Authority, the final say over the Act's key rulemaking and enforcement provisions.

I.

Most Americans know horseracing through occasional high-visibility races, say the Kentucky Derby on the first Saturday of May, or high-visibility books, say *Seabiscuit*. But as the partly initiated and the fully initiated alike can appreciate, the sport comes with risk. Racing a dozen or more jockeys atop sizeable horses around a mile or more track, all with prize money and gambling positions at stake, creates plenty of danger. Over the last seventy years or so, fatal accidents of jockeys in horseraces exceeded those of drivers in NASCAR races. Peta L. Hitchens, Ashley E. Hill, & Susan M. Stover, *Jockey Falls, Injuries, and Fatalities Associated with Thoroughbred and Quarter Horse Racing in California 2007–2011*, at 3, Orthopedic J. of Sports Med. (2013) (129 jockeys killed between 1940 and 2012); *NASCAR Deaths*, Ciancio Ciancio & Brown (Aug. 19. 2024), https://tinyurl.com/3s73htny (92 NASCAR drivers killed in accidents between 1948 and 2024). Faring worse, at least 850 racehorses died in 2024 alone due to racing injuries. Michael A. Fletcher, *How One Organization Plans to Improve Horse Racing Safety*, ESPN (May 2, 2025), https://tinyurl.com/yzbha26u.

Whether it's the risk of pushing horses past their limits or the risks associated with unsafe tracks and doping, or other health and safety issues facing horses and jockeys, no one doubts the imperative for oversight. The initial question, as is so often the case, is whether the regulation should come from local governments or the national government.

The answer for a long time was local. Before 2020, thirty-eight state regulatory regimes supplied an array of horseracing protocols and safety requirements. Kjirsten Lee, *Transgressing Trainers and Enhanced Equines*, 11 J. Animal & Nat. Res. L. 23, 26 (2015).

In 2020, Congress tried a national answer. It did so in conventional and unconventional ways. Conventionally, it enacted a national law, the Horseracing Integrity and Safety Act, to centralize the regulation of thoroughbred racing. 15 U.S.C. §§ 3051–60. Less conventionally, it chose to use a private nonprofit corporation—the Horseracing Integrity and Safety Authority—to help with regulating and enforcing the Act under the supervision of the Federal Trade Commission. The decision to turn to a private entity to regulate sporting events was not wholly unprecedented. It echoed Congress's earlier choice to charter and empower the United States

Olympic Committee to regulate American Olympic participation.  *See* An Act to Incorporate the United States Olympic Association, Pub. L. No. 81-805, 64 Stat. 899 (1950); Amateur Sports Act of 1978, Pub. L. No. 95-606, 92 Stat. 3045.

The Act charges the Horseracing Authority with "developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program."  15 U.S.C. § 3052(a).  The Authority's jurisdiction also includes the "safety, welfare, and integrity" of covered thoroughbreds, jockeys, and horseraces.  *Id.* § 3054(a)(2)(A).  The Authority may expand the Act's coverage to other breeds upon request by a state racing commission or a breed governing organization.  *Id.* § 3054(l).  "As a condition of participating in covered races and in the care, ownership, treatment, and training of covered horses," individuals are required to register with the Horseracing Authority and to sign an agreement to comply with the Authority's rules, standards, and procedures and to cooperate with any investigation by the Authority.  *Id.* § 3054(d).

The Act says that the Horseracing Authority's governing board of directors should have nine members, five "selected from outside the equine industry" and four from within the industry.  *Id.* § 3052(b)(1)(A)–(B).  A separate "nominating committee" comprised of "seven independent members selected from business, sports, and academia" selects the initial members of the governing board and thereafter recommends "individuals to fill any vacancy on the Board."  *Id.* § 3052(d)(1)(A)–(C).  The FTC and the Authority may establish bylaws governing "the procedures for filling vacancies on the Board" and for establishing "term limits for members" of the board.  *Id.* § 3052(b)(3)(C)–(D); *see id.* § 3053(a).

The Horseracing Authority funds its operations through fees on the horseracing industry. Each year, it calculates its budget and apportions amounts owed by each State.  *Id.* § 3052(f)(1)(C).  The States have two options.  They may collect the fees themselves from covered entities and remit the fees to the Authority.  *Id.* § 3052(f)(2)(D).  Or they may allow the Authority to collect the fees directly from the relevant entities.  *Id.* § 3052(f)(3)(D).

The Act empowers the Horseracing Authority to promulgate rules on a variety of subjects:  prohibited medications, laboratory protocols and accreditation, racetrack standards and

protocols, injury analysis, enforcement, and fee assessments.  *Id.* § 3053(a).  The Authority also develops procedures for its investigatory and subpoena powers.  *Id.* § 3054(c).  Once issued, the rules preempt state law.  *Id.* § 3054(b).

The Horseracing Authority has initial authority to implement the rules, monitor compliance, and investigate potential rule infractions.  *Id.* § 3054(c), (h), (i).  The Act directs "the Authority and Federal or State law enforcement authorities" to "cooperate and share information" whenever a covered person may have violated federal or state law in addition to one of the Authority's rules.  *Id.* § 3060(b).  After investigating an infraction, the Authority customarily enforces the rules through internal adjudications subject to "due process" and two layers of review:  by an ALJ and the FTC.  *Id.* §§ 3057(c)(3), 3058.  The Authority also may initiate an enforcement action in federal court, *id.* § 3054(j), though it has yet to exercise this power since Congress passed the Act in 2020.

The Act also permits the Authority to enlist private and governmental organizations to assist in its enforcement efforts.  The Act directs the Authority, for example, to enter into an agreement with a separate private entity to serve as an "independent anti-doping and medication control enforcement organization" and to implement anti-doping rules "on behalf of the Authority."  *Id.* § 3054(e)(1)(E)(i).  The Authority may enter into similar agreements with state horseracing commissions for assistance in enforcing racetrack safety rules.  *Id.* § 3054(e)(2)(A)(i).

Under the Horseracing Act, as originally enacted, the Federal Trade Commission had a confined rulemaking role.  When the Authority proposed rules, the FTC published them for public comment.  After the comment period, the Act directed the FTC to approve any proposed rules if they were "consistent" with the Act and with other "applicable rules approved by the Commission."  *Id.* § 3053(b)–(c) (2020).  The FTC also could issue an "interim" rule if it had "good cause" to do so and if the rule was "necessary to protect" the welfare of horses or the integrity of the sport.  *Id.* § 3053(e) (2020); 5 U.S.C. § 553(b)(B).

This version of the Act prompted several legal challenges.  In a case filed in federal court in Texas, several claimants argued that the Act violated the Constitution by delegating

unmonitored lawmaking power to a private entity.  The Fifth Circuit agreed, reasoning that the FTC's confined oversight did not suffice because the FTC could not modify the rules or otherwise question the Horseracing Authority's policy choices.  *Black I*, 53 F.4th at 872–73, 886–87.

Our court faced a similar challenge.  Oklahoma, West Virginia, Louisiana, their racing commissions, and other entities (collectively, Oklahoma) claimed that the Act unlawfully delegated federal power to a private entity and unlawfully commandeered the States to do the federal government's bidding.  The district court rejected Oklahoma's claims as a matter of law.

After the Fifth Circuit issued its decision and after we heard oral argument in our case, Congress enacted, and the President signed into law, an amendment to the Act that expanded the FTC's oversight role.  The amendment eliminated the FTC's interim-rule authority and instead empowered the FTC to create rules that "abrogate, add to, and modify the rules of the Authority."  15 U.S.C. § 3053(e).

Oklahoma maintained that the Act remained unconstitutional.  We disagreed, reasoning that the FTC's newly expansive rulemaking power made the Horseracing Authority subordinate to the FTC.  *Oklahoma*, 62 F.4th at 229–30.  Neither the Act's rulemaking structure nor its enforcement provisions, we held, violated the non-delegation doctrine.  *Id.* at 231.  Nor did the Act unlawfully commandeer the States, we added.  *Id.* at 233.

Oklahoma filed a petition for a writ of certiorari, which the Supreme Court denied on June 24, 2024.  *Oklahoma v. United States*, 144 S. Ct. 2679 (2024).  On July 5, 2024, the Fifth Circuit revisited its earlier ruling with respect to a similar challenge to the amended Act.  It held that the Authority's new rulemaking power "cured the nondelegation defect" in the Act's rulemaking structure that it identified in its previous decision.  *Black II*, 107 F.4th at 421, 424.  At the same time, however, it ruled that the Act's enforcement provisions violated the private non-delegation doctrine.  *Id.* at 429–30.  The decision prompted Oklahoma to move for rehearing of its denied petition for certiorari on July 18, 2024.  Petition for Rehearing, *Oklahoma v. United States*, No. 23-402 (U.S. July 18, 2024).

On September 20, 2024, the Eighth Circuit entered the picture.  It held that neither the Act's rulemaking structure nor its enforcement provisions facially violated the non-delegation doctrine. *Walmsley*, 117 F.4th at 1038–39.

On October 7, 2024, the Supreme Court requested that the FTC and the Horseracing Authority respond to Oklahoma's motion for rehearing.  Request for Response, *Oklahoma v. United States*, No. 23-402 (U.S. Oct. 7, 2024).  The responses were filed on November 6, 2024.  Responses to Petition for Rehearing, *Oklahoma v. United States*, No. 23-402 (U.S. Nov. 6, 2024).  In view of the division in the circuits, the FTC and the Horseracing Authority agreed that the Court should grant review in one of the three cases.  FTC's Response to Petition for Rehearing at 4, *Oklahoma v. United States*, No. 23-402 (U.S. Nov. 6, 2024); Horseracing Authority's Response to Petition for Rehearing at 11, *Oklahoma v. United States*, No. 23-402 (U.S. Nov. 6, 2024).  As the Court considered these petitions for certiorari, it stayed the mandate in the Fifth Circuit case.  Stay of Mandate, *Horseracing Integrity & Safety Auth. v. Nat'l Horsemen's Benevolent & Protective Ass'n*, No. 24A287 (U.S. Oct. 28, 2024).

Adding another layer of complication, the Court granted certiorari in a distinct private non-delegation challenge, *Consumers' Research,* on November 22, 2024.  In June 2025, the Supreme Court decided *Consumers' Research.*  In the context of that as-applied challenge, it held that an agency may delegate enforcement authority to a private entity so long as it "function[s] subordinately to" the agency and remains "subject to [the agency's] 'authority and surveillance.'"  606 U.S. at 692 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).

On June 30, 2025, the Court granted Oklahoma's motion for rehearing, granted certiorari in all three horseracing non-delegation cases, and vacated and remanded all three cases for further consideration in light of *Consumers' Research*.  *Oklahoma v. United States*, 145 S. Ct. 2836 (2025); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Horseracing Integrity & Safety Auth., Inc.*, 145 S. Ct. 2836 (2025); *Walmsley v. FTC*, 145 S. Ct. 2870 (2025).  That brings us to this second assessment of the Act.

II.

*Mootness.*  First things first:  Does the 2022 amendment to the Act transform this live controversy into a moot one?  When Congress amends a statute, pending claims challenging the law sometimes become moot.  *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc).  Not invariably, however.  If the revised statute continues to place a material burden on the plaintiff that arises from the same theory of unconstitutionality set forth in the complaint, the case remains live.  *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 692–93 (6th Cir. 2022).  A similar conclusion applies if the amendment does not affect other features of the challenge.  *Id.*  Both exceptions apply here.

The amendment to § 3053(e) of the Horseracing Act, clarifying that any rulemaking authority of the Horseracing Authority remains subordinate to the FTC, does not moot Oklahoma's non-delegation claim.  While significant to the outcome of today's case, the amendment changes little else about the Act's basic structure.  The revised Act "operates in the same fundamental ways," with the Authority proposing and enforcing rules under the FTC's oversight, the key difference being that the FTC has more oversight than it did before.  *Id.* at 693. The revised Act likewise presents fundamentally the "same controversy," with Oklahoma continuing to argue that the Act gives unsubordinated power to a private entity.  *Id.*; *see Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, 460 F.3d 717, 720 (6th Cir. 2006).  Nor does the Act moot Oklahoma's anti-commandeering claim.  In reality, the amendment does not change that dispute in any meaningful way.  No party to the case disagrees with these conclusions, and they all urge us to address the validity of the amended Act.

*Remand.*  One other preliminary question remains.  If a legislature changes a law while a non-moot challenge to it remains on appeal, appellate courts may remand the case to the district court to permit it to consider the challenge in the first instance.  The option is discretionary, not mandatory.  In this instance, we see little benefit from a remand because Oklahoma brings facial challenges that raise only legal issues and because the parties and panel have already devoted considerable time and resources to the dispute.  Fortifying this conclusion is the reality that the challengers have asked us to proceed to the merits.

III.

A.

*Non-delegation principles.*  Through the United States Constitution, the People separated the powers of the National Government into three branches.  They vested the legislative power in Congress, the executive power in the President, and the judicial power in the federal courts.  U.S. Const. art. I, § 1; *id.* art. II, § 1; *id.* art. III, § 1.  The People also constrained each branch's use of its power through counterweights in the other branches.  To preserve this balance, the Constitution bars further delegations of power between the branches.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  Any delegation from Congress to an agency within the Executive Branch at a minimum must contain "an intelligible principle" to guide the agency's implementation of the statute.  *Id.* (quotation omitted).

What about delegations to private entities?  Surely, if the Vesting Clauses bar the three branches from exchanging powers among themselves, those Clauses bar unchecked reassignments of power to a non-federal entity.  Just as it is a central tenet of liberty that the government may not permit a private person to take property from another private person, *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388–89 (1798) (opinion of Chase, J.), or allow private individuals to regulate other private individuals, *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 122 (1928), it follows that the government may not empower a private entity to exercise unchecked legislative or executive power.  Those who govern the People must be accountable to the People.  Transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn.

Precedent confirms that unchecked delegations to private entities violate core separation-of-power guarantees.  Consider *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).  A federal statute gave the President discretion to create far-reaching codes of fair competition based on proposals from private entities.  *Id.* at 538, 542.  Rejecting the government's view that this private participation cured any surplus delegation to the President, the Court explained that transforming private groups into legislatures would make things worse

and was "utterly inconsistent" with the constitutional design. *Id.* at 537. The President's complete discretion over the proposals, at any rate, meant that he made the law—the private entities counted only as advisors—and accordingly the Court refused to enforce the law on traditional non-delegation grounds. *Id.* at 538, 542; *id.* at 552–53 (Cardozo, J., concurring).

A year later, the Court applied a similar standard to a similar arrangement under the Bituminous Coal Act, though this one permitted private coal companies to have the final say over regulation of the industry. *Carter v. Carter Coal Co.* reasoned that, by empowering coal producers to set wages and to control the businesses of others, the Act amounted to a "delegation in its most obnoxious form" because such regulation "is necessarily a governmental function." 298 U.S. 238, 310–11 (1936). Appreciating the problem, Congress amended the Act the next year to give the Coal Commission, a federal agency, power to set prices. *See Adkins*, 310 U.S. at 388. After Congress subordinated the private coal producers to a public body (the Coal Commission) that could modify or reject their proposals, the Court determined that the statute did not impermissibly delegate "legislative authority to the industry." *Id.* at 399.

Nearly 90 years later, the Supreme Court applied these non-delegation principles with respect to private parties in *Consumers' Research*. To ensure universal access to communications technologies, Congress developed a mechanism to collect fees from telecommunications companies to subsidize communications services in low-income and rural areas. 606 U.S. at 662–64. Congress empowered the Federal Communications Commission to administer the program and instructed the Commission to rely on a private corporation to help manage the program's operations. *Id.* Relying on *Adkins*, the Court held that this arrangement did not violate the non-delegation doctrine. *Id.* at 695. The Court explained that an agency may "rely on advice and assistance from private actors" if the agency "retains decision-making power." *Id.* at 692. Because the private corporation must "follow[] the FCC's rules" and can only "make[] recommendations," the FCC remains "in control." *Id.* at 694–95.

Taken together, these cases draw a line between impermissible delegations of unchecked lawmaking power to private entities and permissible participation by private entities in developing government standards and rules. *Adkins* and *Consumers' Research* show that a private entity may aid a public agency so long as the agency retains ultimate authority over the

implementation of the federal law.  *See Adkins*, 310 U.S. at 388; *Consumers' Rsch.*, 606 U.S. at 692.   If the private entity creates the law or retains full discretion over any regulations promulgated under it, however, an unconstitutional exercise of federal power emerges.  *See Carter Coal*, 298 U.S. at 311; *Schechter*, 295 U.S. at 537.

Decisions from the courts of appeals hold this line.  Private entities may serve as advisors that propose regulations.  *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974); *Cospito v. Heckler*, 742 F.2d 72, 87–89 (3d Cir. 1984); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977).  And they may undertake ministerial functions, such as fee collection.  *See Pittston Co. v. United States*, 368 F.3d 385, 395–97 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128–29 (3d Cir. 1989).  But a private entity may not be the principal decisionmaker in the use of federal power, *Pittston Co.*, 368 F.3d at 395–97, may not create federal law, *Texas v. Rettig*, 987 F.3d 518, 533 (5th Cir. 2021), may not wield equal power with a federal agency, *Ass'n of Am. R.R. v. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 671–73 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43 (2015), or regulate unilaterally, *Black I*, 54 F.4th at 872.  These principles, for what it is worth, are American through and through.  The state constitutions place similar limits on private exercises of public authority.  *See*, *e.g.*, *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 457 (Tex. 1997).

An illuminating example of how these principles work in practice comes from federal securities law.  The Securities and Exchange Commission regulates the securities industry with the assistance of private, self-regulatory organizations called SROs.  The SROs propose rules for the industry and initially enforce the rules through internal adjudication.  The SEC oversees the rulemaking and the enforcement.  As to the rules, the SEC approves proposed rules if they are consistent with the Maloney Act, and may "abrogate, add to, and delete from" an SRO's rules "as the Commission deems necessary or appropriate."  15 U.S.C. § 78s(b)(2)(C), (c).  As to enforcement, the SEC applies fresh review to the SRO's decisions and actions.  *Id.* § 78s(e); *see Sartain v. SEC*, 601 F.2d 1366, 1369–71 & n.2 (9th Cir. 1979).  In case after case, the federal courts have upheld this arrangement, reasoning that the SEC's control over the rules and their enforcement makes the SROs permissible aids and advisors.  *See R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *Todd & Co.*, 557 F.2d at 1012–13; *First Jersey Secs., Inc. v.*

*Bergen*, 605 F.2d 690, 699 (3d Cir. 1979); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *see also Amtrak I*, 721 F.3d at 671 n.5 (describing the SROs' role as "purely advisory or ministerial").

These precedents all suggest that, at a minimum, a private entity must be subordinate to a federal actor in order to withstand a non-delegation challenge. Whether subordination always suffices to withstand a challenge raises complex separation-of-powers questions. Simplifying matters for today, if not for a future day, the parties accept this framing of the appeal. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020); Appellants' Br. 22, 55; FTC's Br. 10; Horseracing Authority's Br. 17. As the case comes to us, then, the determinative question is whether the Horseracing Authority remains inferior to the FTC with respect to rulemaking and enforcement.

## B.

The Horseracing Authority is subordinate to the agency. The Authority yields to FTC supervision and lacks the final say over rulemaking and enforcement of the law, all tried and true hallmarks of an inferior body. But even if there were doubt about the application of these points to hypothetical rulemaking or enforcement settings, that would not help Oklahoma. In filing this lawsuit, Oklahoma brought a facial challenge to the law. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). In considering a facial challenge, we must focus our inquiry on the circumstances in which the Act is "most likely to be constitutional" rather than imagining "hypothetical scenarios where [the Act] might raise constitutional concerns." *United States v. Rahimi*, 602 U.S. 680, 701 (2024). To succeed, a facial claimant must establish that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

That burden does not diminish when a challenge implicates constitutional structure. The *Salerno* standard applies regardless of whether a facial challenge turns on an individual right or a structural guarantee. *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 604–05, 608 (2004) (rejecting facial challenge to Congress's spending authority to pass an anti-bribery statute applicable to local officials). What matters is whether the theory of invalidity pierces all

implementations of the challenged law.  In the context of individual rights, as an example, a law that allocates a public benefit based solely on the race of the beneficiary will not have any constitutional applications, whether a potential beneficiary is denied a benefit based on race or receives a benefit based on race.  In the context of structure, as another example, improperly designated officers under the Appointments Clause may never exercise power, no matter whether they propose to act modestly or aggressively.  *See United States v. Arthrex, Inc.*, 594 U.S. 1, 14–16, 23–26 (2021).  To succeed in this case, Oklahoma thus must demonstrate that the FTC lacks supervisory power over all of the Authority's rulemaking or enforcement powers.  Oklahoma does not clear this "very high bar," *Moody*, 603 U.S. at 723, in view of numerous applications of the Act's rulemaking and enforcement provisions in which the Horseracing Authority remains subordinate to the FTC.

1.

*Rulemaking.*  The Horseracing Act gives the FTC supervision over the rules that govern the horseracing industry.  The Act permits the Horseracing Authority to draft proposed rules on racetrack safety and anti-doping matters.  But they are just that:  proposals.  No such proposal becomes a binding rule until the FTC approves it, and the Act permits the agency only to approve proposed rules if they are "consistent" with the Act.  15 U.S.C. § 3053(c)(2).  In addition, the Act gives the FTC authority, as it "finds necessary or appropriate," to "abrogate, add to, and modify the rules."  *Id.* § 3053(e).  The FTC's power to review proposed rules, to abrogate existing rules, and to add new rules makes clear who is in charge and who has the final say.

Other features of § 3053(e) show that Congress gave the FTC a comprehensive oversight role.  The provision adds that the FTC may act as it "finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of [this Act] and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of [this Act]."  *Id.*  The final catchall suggests that § 3053(e) spans the Horseracing Authority's jurisdiction.  The parties are one in agreeing that this section allows the FTC to modify rules as it wishes.  Appellants' First Suppl. Br. 1; FTC's Suppl. Br. 1; Horseracing Authority's Suppl. Br. 10.

With § 3053(e)'s broad grant of power to the FTC to write and rewrite the rules comes policymaking discretion.  *See Cospito*, 742 F.2d at 88–89.  When the FTC decides to act, whether by abrogating one of the Horseracing Authority's rules or by introducing its own, the FTC makes a policy choice and necessarily scrutinizes the Authority's proposed policy choices. That is no less true when the FTC decides *not* to act.  In either setting, the FTC may "unilaterally change regulations," *Amtrak I*, 721 F.3d at 671, and "is free to prescribe" the rules, showing that it "retains ultimate authority," *Cospito*, 742 F.2d at 88.  The FTC has recognized as much, explaining that its new "rulemaking power" allows it to "exercise its own policy choices." *Order Ratifying Previous Commission Orders* 3, Fed. Trade Comm'n (Jan. 3, 2023), https://tinyurl.com/dkenwspt.

In full, § 3053(e) gives the FTC ultimate discretion over the content of the rules that govern the horseracing industry and the Horseracing Authority's implementation of those rules. It follows that ultimate "law-making is not entrusted to the [Authority]," *Adkins*, 310 U.S. at 399, as the Authority "must carry out all its tasks consistent with the [FTC's] rules," *Consumers' Rsch.*, 606 U.S. at 693 (quotation omitted).  That makes the FTC the primary rule-maker, and leaves the Authority as the secondary, the inferior, the "subordinate" one.  *Id.* at 692; *see Adkins*, 310 U.S. at 388.

Accountability considerations lead to the same destination.  With its authority to have "the final word on the substance of the rules," the FTC bears ultimate responsibility for them. *Black I*, 53 F.4th at 887; *see Adkins*, 310 U.S. at 399; *cf. Lynn*, 502 F.2d at 59.  The People may rightly blame or praise the FTC for how adroitly (or, let's hope not, ineptly) it "ensure[s] the fair administration of the Authority" and advances "the purposes of [the Act]."  15 U.S.C. § 3053(e).

Oklahoma makes several contrary arguments.  It points out that the Act permits the FTC only to review proposed rules by the Authority for "consisten[cy]" with the Act. 15 U.S.C. § 3053(c).  But that's searching for clouds on a cloudless day.  A sure sign that Congress has not delegated too much authority to an agency or a private entity is a directive that *all* regulations promulgated under the Act must be consistent with it.  Even so, Oklahoma adds, doesn't the word "consistency" at some level of generality permit the Horseracing Authority to obtain approval for proposed rules that contain embedded policy choices with which the FTC might

disagree?  We doubt any such risk exists.  But even if it did, the FTC's authority to modify *any* rules for *any* reasonable reason at all, including policy disagreements, ensures that the FTC retains ultimate authority over implementation of the Horseracing Act.

The FTC's review authority in this respect parallels similar authority delegated to the SEC under the Maloney Act.  It provides that the SEC "may abrogate, add to, and delete from . . . the rules of [the private entity] as the Commission deems necessary or appropriate." 15 U.S.C. § 78s(b)(2)(C), (c).  The same is true under the Coal Act.  It provides that the Coal Commission may "approve, disapprove, or modify" proposals.  *See* Bituminous Coal Act of 1937, Pub. L. No. 75-48, § 4, 50 Stat. 72, 78.  All of this explains why the Supreme Court upheld the Coal Act in *Adkins* and why every court of appeals to address the validity of this kind of delegation under the Maloney Act has upheld it.

Harking back to the "consistency" provision, Oklahoma worries that a proposed rule by the Horseracing Authority could govern a dispute until the FTC undoes a rule it dislikes through the sometimes slow, ever deliberate, notice-and-comment process.  We doubt, to repeat, the premise of the argument—that the FTC's consistency review will permit problematic rules to get through.  But let us grant the premise for now to explain an independent reason this argument does not carry the day.

Even though the FTC's modification authority under § 3053(e) customarily would run through ordinary rulemaking, that current reality need not be a future reality.  For one, the threat of modification is not likely to miss the attention of the Authority.  For another, the FTC has power to initiate new rules, not just to modify rules it does not like.  To the extent this timing gap creates a problem, the FTC is free to resolve it ahead of time.  It might adopt a rule, for example, that all newly enacted rules do not take effect for a certain period of time, thereby giving the FTC time to review rules and prepare preemptive modifications.  Or it might decide to hold off on publishing a rule proposed by the Authority until the FTC has promulgated its own modified version of the rule.  *See* 15 U.S.C. § 3053(c)(1) (requiring the FTC to approve or disapprove proposed Authority rules "[n]ot later than 60 days" after the FTC publishes the proposal, but placing no time limit on when the FTC publishes such proposals).

This argument overlooks another reality. When the FTC reviews the Horseracing Authority's proposed rules, it asks not just whether they are "consistent" with the Act; it also asks whether they are "consistent" with other "applicable rules approved by the Commission." *Id.* § 3053(c)(2). Any risk of a policymaking gap between initial consistency review and initial full review—and, to repeat, we doubt any such risk exists—will diminish over time as the FTC chooses to exercise (or not to exercise) its ample authority to initiate new rules or modify old ones. Over time, the FTC's threshold consistency review will account for its own full-throated rulemaking power. None of these arguments, let us not forget, interferes with the FTC's power to "abrogate, add to, and delete from" the rules whatever it wishes and however often it wishes.

Oklahoma persists that the FTC's duty under the Administrative Procedure Act to explain any changes to the rules limits its hand. But that means only that it may not arbitrarily alter the rules. The APA does not limit the FTC's authority to disagree with the Horseracing Authority over a policy choice delegated to the agency by Congress. The FTC "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It is enough that "there are good reasons" for the new policy "and that the agency believes it to be better." *Id.* (emphasis omitted).

No matter, Oklahoma adds: The Horseracing Authority's ability to expand its jurisdiction to breeds other than thoroughbreds escapes the FTC's review. Not so. The FTC's § 3053(e) power is sufficiently broad to allow it to revoke any decision from the Authority on this or any other topic, or to place procedural and substantive conditions on such decisions.

In the last analysis, "in the relationship between the two"—the FTC and the Horseracing Authority—the FTC "dominates" when it comes to rulemaking. *Consumers' Rsch.*, 606 U.S. at 693. The Act's grant of power to the FTC to set whatever rulemaking policy it wishes will lead to plenty of constitutional exercises of that power and perhaps only constitutional exercises of that power. The existence of ample permissible exercises of power by itself suffices to uphold the Act's rulemaking provisions against this facial challenge.

2.

*Enforcement.*   A similar conclusion applies to Oklahoma's attack on the enforcement provisions of the Act.  This challenge is harder to answer in some ways and easier in others.  It is the more difficult of the challenges to rebut because the Horseracing Authority appears to have more authority over some enforcement features of the Act than it does with respect to rulemaking.  But it is easier because challenges to enforcement provisions quintessentially lend themselves to as-applied challenges, not to overriding facial challenges.  *See Sabri*, 541 U.S. at 604–05.  Oklahoma's "pre-enforcement" facial challenge to the Act's enforcement provisions seeks "to leave nothing standing."  *Warshak v. United States*, 532 F.3d 521, 528 (6th Cir. 2008) (en banc).  Oklahoma asks us to declare the Act's enforcement provisions unconstitutional not only as to the parties before us, but also "on behalf of *all*" who fall under the Act and with respect to any potential enforcement of the Act.  *Id.* (emphasis in original).  "That is not how constitutional litigation typically proceeds."  *Id.*  Because enforcement challenges often turn on "an understanding of complex factual issues," *id.* (quotation omitted), plaintiffs generally, and wisely, choose to challenge enforcement provisions as applied to them, *cf. Morrison v. Olson*, 487 U.S. 654, 668 (1988) (as-applied challenge to independent counsel's power to issue subpoenas), and seek relief only as to the parties in the case, *cf. Trump v. CASA, Inc.*, 606 U.S. 831, 850–52 (2025).

By pursuing a facial challenge, Oklahoma took a different path.  That choice comes at a cost.  If the enforcement provisions of the Act "'could conceivably be' implemented in a constitutional manner," that will prove "fatal" to Oklahoma's facial challenge.  *Warshak*, 532 F.3d at 530 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 456–57 (2008)).  Several such enforcement actions would be permissible.

Begin with the Horseracing Authority's main enforcement tool and the only one used to date: an internal enforcement action.  In that setting, the Authority may investigate a violation of the rules and propose a sanction.  But it may not impose a sanction without oversight.  Any aggrieved entity may obtain review from an Administrative Law Judge over any sanction proposed by the Horseracing Authority.  15 U.S.C. § 3058(b).  After that, the FTC has full authority to review the Authority's enforcement actions with fresh eyes.  *Id.* § 3058(c)(1)–(2).

Through this independent review, the FTC may reverse any sanction by the Authority. *Id.* § 3058(c)(3)(A)(1).

As with rulemaking, so with adjudication when it comes to finality. The Authority's adjudication decisions do not become final until the FTC has the opportunity to review them. *See Consumers' Rsch.*, 606 U.S. at 693 (private entity subordinate to FCC because "anyone aggrieved by an action of the [private entity] may seek *de novo* review by the Commission"); *Cospito*, 742 F.2d at 88; *Todd & Co.*, 557 F.2d at 1012–14. No sanction thus goes into final effect without the FTC's "say-so." *Consumers' Rsch.*, 606 U.S. at 695. In this way, the Horseracing Authority is "subject to [the FTC's] pervasive surveillance and authority," making the Authority "an aid" to the FTC, not its choreographer. *Adkins*, 310 U.S. at 388. If the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction. 15 U.S.C. § 3058(d).

These two layers of review, and the existence of this stay authority, by themselves insulate the Act from a successful facial challenge. In-house adjudications serve as the Horseracing Authority's primary tool, and the sole tool during the first several years of enforcing the Act, for sanctioning rulebreakers. Surely there will be plenty of sanctions that do not involve any meaningful investigation or any use of subpoenas—say, an instance of excessive horse cropping by a jockey fully captured on film. In that setting, all that will matter is the extent and amount of the sanction. Full review of such a proposed sanction by the FTC before it goes into effect does not violate public or private non-delegation principles.

Keep in mind, too, that the FTC's § 3053(e) rulemaking power provides it with an additional means to supervise the Authority's enforcement practices. Take an example to illustrate the point. Imagine the FTC initially adopted a laissez-faire mindset toward thoroughbred horseracing, and the Horseracing Authority ran heedlessly with that authority. Section 3053(e) gives the FTC tools to bring an overzealous Horseracing Authority to heel. The FTC could begin with rules constraining the Authority's investigations and increasing the procedural rights of suspected rulebreakers. The FTC could abrogate rules that lead to petty violations. The FTC could promulgate rules that change the elements of a rule violation by, say, increasing the burden of proof, imposing a state-of-mind requirement, or shortening any

limitations periods. The FTC could require that the Authority seek its authority before investigating an incident. The FTC could require that the Authority provide a suspect with a full adversary proceeding and with free counsel. The FTC could modify rules to decrease the penalties for rule violations. And the FTC could require that the Authority meet a burden of production before bringing a lawsuit.

The FTC need not stop at procedural rules governing "*how* the Authority enforces [the Act]." *Black II*, 107 F.4th at 433 (emphasis in original). Section 3053(e) also empowers the FTC to determine *who* the Authority investigates in the first place. The FTC could promulgate rules requiring, for instance, that the Authority drop a misguided investigation into a particular jockey or, conversely, that the Authority pursue an enforcement action against a recalcitrant rule breaker.

Still further, the FTC could require the Horseracing Authority to seek its permission before pursuing *any* enforcement action. Recent developments offer a proof of concept. The Authority itself recently proposed a rule that would require the FTC's approval before the Authority may issue a subpoena or bring a civil enforcement action. 90 Fed. Reg. 43,431, 43,443–45 (Sep. 9, 2025). That is hardly evidence of a private entity "running riot." *Schechter*, 295 U.S. at 553 (Cardozo, J., concurring). The FTC is free to beef up that rule and micromanage every particularized decision the Authority makes in an investigation. Or the FTC could decide to take a more hands-off approach. No matter which way it goes, the FTC's capacity to control the Authority's enforcement activities ensures that the FTC, not the Horseracing Authority, is the agency of ultimate resort that decides how the federal government enforces the Act. Serial layers of review of any proposed sanctions, together with the FTC's rulemaking powers over enforcement actions, give it "pervasive" oversight and control of the Authority's enforcement activities, just as in the rulemaking context. *Adkins*, 310 U.S. at 388.

This conclusion by the way does not depend on how the FTC employs its power—by action or inaction. Whether the FTC becomes a demanding taskmaster or a lenient one, the FTC *could* subordinate every aspect of the Authority's enforcement "to ensure the fair administration of the Authority . . . or otherwise in furtherance of the purposes of [the Act]." 15 U.S.C.

§ 3053(e) (as amended).   That potential suffices to defeat a facial challenge, where Oklahoma must show that no feature of the enforcement provisions of the Act should be left standing.

Oklahoma persists that this interpretation of § 3053(e) contradicts other provisions of the Act.   It points to the Act's prefatory language, which says that the FTC and the Authority shall implement the Act "each within the scope of their powers and responsibilities under this chapter."   15 U.S.C. § 3054(a).   Oklahoma maintains that our reading of the FTC's rulemaking powers makes a hash of this division of labor.   But this argument, too, sees shadows instead of silver linings.   Under the Act, one of the FTC's key responsibilities is to "abrogate, add to, and modify the rules of the Authority . . . as the [FTC] finds necessary or appropriate" to further "the purposes of" the Act.   *Id.* § 3053(e).   Section 3053(e) permits the FTC to employ its sweeping rulemaking powers to govern all aspects of the Authority's operations.   An agency does not exceed the scope of its power by faithfully exercising it.

Section 3059 doesn't help Oklahoma either.   That provision targets certain "unfair or deceptive" practices in selling horses.   *Id.* § 3059.   While the Horseracing Authority may, subject to the FTC's supervision, initiate enforcement of other provisions of the Act, it may only "recommend that the [FTC] commence an enforcement action" to enforce § 3059.   *Id.* § 3054(c)(1)(B).   That makes sense.   Unfair trade practices fit comfortably within the FTC's bailiwick.   Unlike other aspects of the Act involving the minutiae of horseracing, this is an area where Congress determined that the FTC did not need help.   Far from suggesting that Congress intended to limit the FTC's supervisory power, this provision speaks to the inherent limits of the Authority's expertise as "an aid" to the FTC.   *Adkins*, 310 U.S. at 388.

These arguments suffer from another defect.   Statutes should not be read "extravagantly, the better to create a constitutional problem."   *Consumers' Rsch.*, 606 U.S. at 690.   They "should be read, if possible, to comport with the Constitution, not to contradict it."   *Id.* at 691.   That is particularly so where an inter-branch dialogue led to amendments designed to conform the Act to the Constitution's requirements.   The Act never grants the Authority exclusive enforcement power.   The statute uses the word "exclusive" only once, declaring that the FTC *and* the Authority together "exercise independent and exclusive national authority" to regulate horseracing.   15 U.S.C. § 3054(a)(2).   By urging us to read the Act to vest exclusive enforcement

power in the Horseracing Authority, Oklahoma proposes an interpretation that maximizes constitutional risks rather than minimizing them. Where fairly possible, however, we should harmonize statutes with the Constitution, not create chasms between them.

Oklahoma points out that an agency may not "cure an unlawful delegation . . . by adopting in its discretion a limiting construction of the statute." *Whitman*, 531 U.S. at 472. That is true in a traditional non-delegation case. An agency may not fix a statute that lacks an "intelligible principle" by supplying intelligible principles itself or by otherwise denying itself the power Congress unduly gave it. But that's not what's going on today. In this private non-delegation dispute, the issue is whether Congress gave final enforcement and rulemaking authority to the relevant agency, the FTC. If it did and if the FTC exercises that authority to subordinate the Horseracing Authority to its policy preferences, that is not an end run around the non-delegation doctrine. It is proof that no improper delegation to a private entity occurred in the first place. The broad rulemaking authority that Congress delegated to the FTC demonstrates that Congress empowered the agency to supervise the Horseracing Authority and act on its "advice and assistance" as it wishes. *Consumers' Rsch.*, 606 U.S. at 692.

Oklahoma's reliance on *Alpine Securities Corp. v. FINRA* likewise comes up short and in the end proves our point. 121 F.4th 1314 (D.C. Cir. 2024). In that as-applied challenge to an enforcement action, the D.C. Circuit held that the private non-delegation doctrine barred an SRO under the Maloney Act from summarily expelling a company from the securities industry without prior SEC review. *Id.* at 1326, 1331; *see id.* at 1343 (Walker, J., concurring in the judgment in part and dissenting in part). The decision illustrates the difference between facial and as-applied challenges and the wisdom of using as-applied challenges to restrict unduly zealous enforcement actions. If the Horseracing Authority ever forces a company to "shut down," making "any later review" by the agency no more than an "academic exercise," *id.* at 1326, 1331 (majority opinion), as happened in *Alpine Securities,* an as-applied challenge to that enforcement action would be waiting in the wings. And the federal courts in this circuit will be open to hear it. But today, the parties presented us with a facial challenge, in which we must "consider the circumstances in which" the Act is "most likely to be constitutional" instead of

imagining hypothetical worst-case scenarios in which the Act might cross constitutional lines. *Rahimi*, 602 U.S. at 701.

Oklahoma falls back on the proposition that, at the very least, the Horseracing Authority's power to bring civil enforcement actions on its own initiative in federal court under § 3054(j) must violate the private non-delegation doctrine. The power to enforce the law through civil lawsuits, Oklahoma contends, may not reside outside the executive branch.

"Difficult and fundamental questions," we appreciate, arise when private entities enforce federal law. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring). In one direction, it appears to cut against the grain to permit private entities to make such discretionary decisions, whether to bring an enforcement action or whether to engage in narrow or broad investigations of alleged violations of the law. In the other direction, "[p]rivate citizens [have been] actively involved in government work," including investigations and prosecutions, throughout our country's history. *Filarsky v. Delia*, 566 U.S. 377, 385 (2012). "Private detectives and privately employed patrol personnel" have served "as special policemen," *id.* at 387 (quotation omitted), and at times in our history "private lawyers were regularly engaged to conduct criminal prosecutions," *id.* at 385.

The question, then, is not whether a private entity performs what looks like an enforcement function. It is whether the private entity is subject to the agency's supervision. *See Consumers' Rsch.*, 606 U.S. at 695. An agency is free to enlist a private entity to serve "as an aid" even in carrying out executive functions. *See Adkins*, 310 U.S. at 388. The test is whether the private entity remains "subject to [the agency's] pervasive surveillance and authority" when it matters. *Id.*

It is premature and inappropriate to finally resolve the validity of § 3054(j) in today's case. In the first place, Oklahoma chose to bring a facial challenge to the "Act's delegation of law-enforcement power to the Authority" in general, not to any one enforcement provision. Appellants' Second Suppl. Br. 58–59; *see* R.53 ¶ 11 (amended complaint). Having litigated the case as a broad facial challenge to the enforcement provisions, Oklahoma may not now leverage one provision to invalidate all of them. Nor did Oklahoma, by the way, argue below or in its

written submissions on appeal that, if this one provision is invalid and if it is unseverable, then all of the Act's enforcement provisions must fall.

In the second place, serious standing, ripeness, and mootness questions would arise if Oklahoma brought a single-shot challenge to § 3054(j). Keep in mind that the Authority has *never* filed a civil enforcement action under § 3054(j) since Congress passed the law. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). And keep in mind that the Authority has proposed a rule for the FTC to approve that would require the FTC, under the Act's delegated powers, to approve any such action before it is filed. That rule might moot this very concern. Oklahoma cannot smuggle a truly hypothetical, likely unripe, perhaps soon-to-be moot, pre-enforcement challenge to a single provision under the cover of a broad facial challenge.

In the third place, a challenge to this enforcement provision brings into play two salient and unbriefed issues, one set of which overlaps with the other enforcement provisions and the other of which does not. As for the overlapping question, it remains unclear whether any investigations and enforcement actions conducted by the Authority count as governmental action. Put another way, do the Fourth Amendment (*e.g.*, no unreasonable searches and seizures) and Fifth Amendment (*e.g.*, no compelled testimony, no due process violations) limit the Authority's power to investigate alleged violations and enforce its rules? We are not prepared to hazard a guess and see no need to do so in the context of a facial challenge in which no party examined the issue.

As for the non-overlapping question, the Act appears to require regulated entities to waive challenges to the Authority's general enforcement authority, 15 U.S.C. § 3054(d), though not its power to initiate an action under § 3054(j). Here is what the Act says in relevant part: "As a condition of participating in covered races and in the care, ownership, treatment, and training of covered horses, a covered person shall register with the Authority[.] [That registration] shall include an agreement by the covered person to be subject to and comply with the rules, standards, and procedures developed and approved under [§ 3054(c)]." *Id.* § 3054(d)(1)–(2). SROs under the Maloney Act impose a similar requirement. *Id.* § 78o(b)(8); *see, e.g.*, FINRA Bylaws, art. IV, § 1(a) (FINRA members must "agree[] to comply with" FINRA's rules and enforcement decisions). Because the parties did not brief this issue, it

remains unclear how broadly this waiver applies and whether, if it applies broadly, the waiver amounts to an unconstitutional condition.  *See Rust v. Sullivan*, 500 U.S. 173, 197–98 (1991).  Sorting out all of these issues ought to wait until the Authority invokes these enforcement provisions against a regulated entity in a way that implicates these potential concerns—still a figment in the public's imagination—at which time the meaning and enforceability of the relevant provisions can be discerned.  Else, we would be forced to address the "gritty who/what/when details of enforcement" before they "have been worked out" in an actual or threatened enforcement action.  *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 958 (6th Cir. 2020).

As this case illustrates, litigation by hypothetical is a one-way street when it comes to facial challenges to a statute.  A reviewing court may reject a challenge based on potential applications of the statute that avoid constitutional shoals.  But it may not invalidate a statute based on hypothetical applications that have yet to occur.  Like the D.C. Circuit when it comes to the Maloney Act, *see Alpine Sec.*, 121 F.4th at 1322–24, we will wait for an as-applied challenge to the Act before handling some of the enforcement issues raised by Oklahoma.  Having resolved this challenge in the facial context in which it comes to us, we will save resolution of other enforcement questions, if such questions there be, for a day when the Authority's actions and the FTC's oversight appear in concrete detail, presumably in the context of an actual enforcement action.

## IV.

Oklahoma separately claims that two provisions of the Horseracing Act, § 3060(b) and § 3052(f), violate the anti-commandeering guarantee of the Tenth Amendment.  Oklahoma lacks standing to challenge the first provision, and the second one does not count as a cognizable form of commandeering.

## A.

Oklahoma initially sets its sights on § 3060(b), which requires state authorities to "cooperate and share information" with the Horseracing Authority or federal agencies.  Right or

wrong about whether this requirement amounts to commandeering, Oklahoma and the other State plaintiffs lack standing to challenge it.

Standing arises from the Constitution's mandate that federal courts decide only "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. A plaintiff must establish standing for each claim it presses and each statutory provision it challenges. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To do that, it must point to an injury that is traceable to the defendant's conduct and that a judicial decision can redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In a pre-enforcement challenge like this one, a plaintiff must also allege a "credible threat" of future enforcement. *Driehaus*, 573 U.S. at 167.

Oklahoma has not carried this burden. Even if Oklahoma is correct that § 3060(b) unlawfully orders the States to cooperate, the provision does not contain a penalty or enforcement mechanism. And Oklahoma does not point to any actual or threatened enforcement actions. An unenforceable statutory duty does not give rise to Article III standing, *California v. Texas*, 593 U.S. 659, 669–70 (2021), and "mere conjecture" about possible enforcement is not any better, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013).

Oklahoma asserts in response that wrongdoing will "frequently" implicate both federal and state law and thus trigger the duty to cooperate. R.86 at 10. But the question is not how often the opportunity for cooperation may arise; it is whether the defendants can or will mandate cooperation when that time comes. Even so, Oklahoma notes, the Horseracing Authority may penalize States that refuse to cooperate. But the Authority's sanction power extends only to covered persons, a term that does not include States. 15 U.S.C. §§ 3051(6), 3054(d), 3057(a)(1); *see Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991). The same is true of the Authority's ability to initiate civil lawsuits. 15 U.S.C. § 3054(j).

Absent a credible allegation that the Horseracing Authority or the FTC can or will enforce § 3060(b), Oklahoma lacks standing to challenge it. *California*, 593 U.S. at 671–72.

B.

Oklahoma separately claims that § 3052(f) puts the States to an unconstitutionally coercive choice. While § 3052(f)'s threat of preemption gives Oklahoma standing, *Kentucky v. Biden*, 23 F.4th 585, 598–601 (6th Cir. 2022), the provision does not commandeer the States.

As separate sovereigns, Congress may not require the States to implement federal programs. *Printz v. United States*, 521 U.S. 898, 925 (1997). Nor may the federal government issue "orders directly to the States" to carry out this or that federal program. *Murphy v. NCAA*, 584 U.S. 453, 470 (2018). At the same time, Congress may "encourage a State to regulate" or "hold out incentives" in hopes of "influencing a State's policy choices." *New York v. United States*, 505 U.S. 144, 166 (1992).

One option in this last respect is that Congress may encourage the States through conditional preemption. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 290 (1981). Instead of preempting state law altogether, Congress may offer States a regulatory role contingent on following federal standards. *New York*, 505 U.S. at 167–68. The choice brings consequences. If a State participates, it often has discretion in how it implements the program. *See Hodel*, 452 U.S. at 289. If a State decides not to participate, the State's activities are preempted. By offering States such a non-coercive choice—regulate or be preempted— Congress has not violated any constitutional imperatives. *Murphy*, 584 U.S. at 476; *New York*, 505 U.S. at 167; *Hodel*, 452 U.S. at 288–91; *FERC v. Mississippi*, 456 U.S. 742, 769 (1982).

That's how § 3052(f) operates. It presents States with a choice, not a command. States may elect to collect fees from the industry and remit the money to the Horseracing Authority or States may refuse. That's their call. If a State participates, it gains discretion over how the fees are collected. 15 U.S.C. § 3052(f)(2)(D). If a State refuses, the Authority collects the fees itself, and the State "shall not impose or collect from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters." *Id.* § 3052(f)(2)(D), (3)(D).

This scheme fits comfortably within the conditional preemption framework. Section 3052(f) "simply establish[es] requirements for continued state activity in an otherwise pre-emptible field." *FERC*, 456 U.S. at 769; *see Printz*, 521 U.S. at 925–26. And because

Congress may regulate horseracing under its commerce power, there is nothing unconstitutional about Congress "offer[ing] States the choice of regulating that activity according to federal standards or having state law pre-empted." *New York*, 505 U.S. at 173–74.

Section 3052(f) also lacks the hallmark of commandeering: a "direct" order to the States. *Murphy*, 584 U.S. at 471. Section 3052(f)'s statement that a State "shall not impose or collect" certain fees may sound like a command, true enough. 15 U.S.C. § 3052(f)(3)(D). But preemption often carries that tone, as similar language in other statutes confirms. *See, e.g.*, 42 U.S.C. § 7543(a) (1988) ("No State . . . shall adopt or attempt to enforce any standard relating to the control of emissions . . . ."); 49 U.S.C. § 40116(b) ("A State . . . may not levy or collect a tax [or] fee . . . on an individual traveling in air commerce."). Because Congress often speaks in this manner, "it is a mistake to be confused" by preemption provisions that "appear to operate directly on the States." *Murphy*, 584 U.S. at 478. Congress in this instance offers the States a choice, as Oklahoma all but concedes. Reply Br. 2, 25, 26, 27 (referring to § 3052(f) as a "threat of preemption"). A choice is not a command. *See Printz*, 521 U.S. at 925–26.

All of this is not to say "that the choice put to the States—that of either abandoning regulation" or assisting the Authority—is an easy one or a good one as a matter of policy. *FERC*, 456 U.S. at 766. Fraught though this decision may be, Congress has not commandeered the States by putting them to the choice.

Oklahoma's principal counterargument is that a choice between collecting fees and losing fee-collecting authority is illegitimate, coercive, or punitive. We don't think so.

Oklahoma begins by arguing that § 3052(f)'s choice—collect fees for the Horseracing Authority or stop collecting entirely—commandeers the States because Congress may not force the States to adopt either alternative. *See New York*, 505 U.S. at 175–76. Congress may not force a State to collect fees, true. *See Printz*, 521 U.S. at 933. But Congress may use its commerce power to preempt the field of horseracing, preventing States from imposing fees. *See FERC*, 456 U.S. at 764; *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Threatening to do so, it follows, is a "conditional exercise of [a] congressional power." *New York*, 505 U.S. at 176.

Oklahoma's response that a "threat of preemption," Reply Br. 25, is coercive runs aground on contrary precedent. The Court has rejected the argument "that the threat of federal usurpation of their regulatory roles coerces the States." *Hodel*, 452 U.S. at 289.

Even so, Oklahoma continues, threatening a State's taxing authority is especially coercive. We fail to see how. The validity of conditional preemption does not fluctuate with the power that is threatened. *See id.* at 290–91. This would not be the first time a State's taxing power was preempted. *See Aloha Airlines, Inc. v. Dir. of Tax'n*, 464 U.S. 7, 14 n.10 (1983); *Exxon Corp. v. Hunt*, 475 U.S. 355, 360–63 (1986).

Oklahoma presses the point that Congress's financial incentives may become so overwhelming that a State effectively cannot refuse. *See South Dakota v. Dole*, 483 U.S. 203, 211–12 (1987). Grafting this principle on conditional preemption raises legal and factual problems. Legally, it is bereft of support; no case evaluates conditional preemption by looking to a State's monetary incentives. Factually, Oklahoma falters because it does not quantify its expected loss. *See NFIB v. Sebelius*, 567 U.S. 519, 580–82 (2012) (opinion of Roberts, C.J.) (comparing an incentive to a State's budget). Without knowing how much money is at stake, how are we to say the sum is too high?

Oklahoma adds that the threat is punitive because it serves no purpose other than to obtain compliance. Conditional preemption, however, amounts to a "permissible method of encouraging a State to conform to federal policy." *New York*, 505 U.S. at 168; *see FERC*, 456 U.S. at 766. And a State that sees itself as a sovereign sometimes must act like one. Another reason is not difficult to find anyway. The fee provisions ensure that a single entity—whether a State or the Authority—imposes fees on the horseracing industry for all anti-doping and racetrack safety matters. Eliminating "double taxation" and fostering uniformity are adequate grounds to preempt parallel collection regimes. *Aloha Airlines*, 464 U.S. at 9–10; *see Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 97–99 (2017); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (plurality opinion).

Oklahoma next argues that Congress failed to "appropriate the funds needed to administer the program" by forcing States to pay for collecting fees even if they refuse to act as

the Authority's fee collector. *Murphy*, 584 U.S. at 474. Not so. Private parties pay for the Authority's operations. 15 U.S.C. § 3052(f)(2)(D), (3)(B). And if a State does not collect fees under the Act, the Authority incurs the cost of doing so. Even if States suffer a pocketbook loss from preemption, that does not force them to pay for the program. *See Hodel*, 452 U.S. at 288.

Oklahoma also worries that the scheme blurs accountability. Conditional preemption, however, leaves a State and its citizens with "the ultimate decision as to whether or not the State will comply." *New York*, 505 U.S. at 168. The ability to choose ensures that state and federal entities are accountable for their roles. *See id.*

We affirm.